**Everett Roy LYON, Plaintiff,**

v.

**Paul W. GROSSHEIM, Defendant.**

Civ. No. 4–88–CV–31689.

United States District Court,
S.D. Iowa, C.D.

Sept. 30, 1992.
As Amended Oct. 30, 1992.

■■■■■■■■■■■■
■■■■■■■■■■■■

Patricia M. Hulting, Roehrick, Hulting & Moisan, Des Moines, Iowa, for plaintiff.

William A. Hill, Asst. Atty. Gen., for defendant.

## MEMORANDUM OPINION AND ORDER

BENNETT, United States Magistrate Judge.

### I. INTRODUCTION AND PROCEDURAL BACKGROUND

Plaintiff, Everett Roy Lyon, ("Lyon"), is an inmate at the Iowa State Penitentiary at Fort Madison, Iowa ("ISP"). Lyon asserts that his First Amendment rights under the United States Constitution were violated by Defendant, Paul W. Grossheim ("Grossheim")[1] denying him certain religious comic books. In denying Lyon these religious publications, Grossheim relied upon administrative regulations providing that an inmate may be denied a publication if the publication "is likely to be disruptive or produce violence." Grossheim and other prison administrators claim that the religious publications at issue are "anti-Catholic," "blatant bigotry" and are, therefore, likely to be disruptive. Lyon challenges the constitutionality of the regulations, both facially and as applied. Lyon requests declaratory and injunctive relief, compensatory and punitive damages, and attorney fees.

Lyon initially filed this action pro se pursuant to 42 U.S.C. § 1983 against Grossheim, the Director of the Iowa Department of Corrections.[2] Counsel was subsequently appointed for Lyon. This case was initially referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) for proposed findings of fact and recommendations for the disposition. The parties subsequently consented to a trial of this matter before a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). The case was tried without a jury, post trial briefs were filed, and the case is now fully submitted.

### II. FINDINGS OF FACT

#### A. Regulations

Iowa Administrative Code r. 291–20.-6(4)(a) (1989) provides that an authorized reason for denying a publication to an inmate is that the publication "[i]s likely to be disruptive or produce violence."[3] Rule 20.6(4)(a) is identical to State of Iowa, Department of Corrections policy IN–V–80 (4).[4] Lyon challenges the constitutionality of the regulations, both facially and as applied.

A publication review committee ("the committee"), made up of three members appointed by the Director of the Iowa Department of Corrections, is authorized to determine whether a publication should be allowed into the correctional facility. See Iowa Admin.Code r. 291–20.6(2)–(3) (1989). At all times relevant to this litigation, the three members of the Committee were John Sissel, the Deputy Warden at the Iowa State Men's Reformatory in Anamosa, Iowa; Paul Hedgepeth, the Deputy

---

1. Following the trial of this matter, Defendant Grossheim, the Director of the Iowa Department of Corrections, died. Neither party has filed a suggestion of death or moved for substitution pursuant to Federal Rule of Civil Procedure 25(d). However, because the court determines that Defendant Grossheim was sued in his official capacity, see infra p. 1557, his "successor is automatically substituted as a party." Fed. R.Civ.P. 25(d).

2. Plaintiff's Complaint and Amended Complaint both named James Helling as an additional defendant. At trial, Plaintiff moved to dismiss Mr. Helling as a party to this case. Plaintiff's motion to dismiss Mr. Helling was granted.

3. Iowa Administrative Code r. 291–20.6(4)(a) (1989) provides that:

   **20.6(4)** A publication may be denied when the publication presents a danger to the security or order of an institution or is detrimental to the rehabilitation of an inmate. Authorized reasons for denying a publication are that the publication:

   a. Is likely to be disruptive or produce violence.

4. Iowa Administrative Code Ch. 291 was transferred to Chapter 201 in 1991.

Warden at ISP in Ft. Madison; and Linda Robertson, a librarian from Des Moines, Iowa. A list of publications which have been rejected by the committee is maintained at ISP called the *Denied Publications* list. If a publication is rejected, an inmate has ten days following the committee's decision to appeal to the Director of the Department of Corrections. *See* Iowa Admin.Code r. 291–20.6(7) (1989).[5]

### B. Facts Relating to the Parties

On June 2, 1988, Lyon received a "Notice of Rejection of Correspondence" indicating that fifteen publications he had ordered from Chick Publications ("Chick") had been disapproved by the committee, and were being held in the mailroom.[6] The notice stated that the staff person responsible for this decision was James Helling. On the same date, Lyon also received a notice that six additional publications were being referred to the committee for their inspection.[7] Altogether, Lyon ordered twenty-one publications from Chick Publications.[8]

---

5. Iowa Administrative Code r. 291–20.6(7) (1989) provides:

> An inmate may appeal the committee's decision or the denial of a publication for treatment reasons within ten days of receipt of the decision by filing written objections to the Director, Department of Corrections, Capitol Annex Building, 523 East 12th Street, Des Moines, Iowa 50319. The director's decision shall be final.

6. The following Chick publications were denied to Plaintiff: (1) *King of Kings*, Sword Series, Vol. 1; (2) *The Broken Cross*, Crusaders Series, Vol. 2; (3) *Scar Face*, Crusaders Series, Vol. 3, (4) *Exorcist*, Crusaders Series Vol. 4; (5) *Chaos*, Crusaders Series, Vol. 5; (6) *Primal Man?*, Crusaders Series, Vol. 6; (7) *The Ark*, Crusaders Series, Vol. 7; (8) *The Gift*, Crusader Series, Vol. 8; (9) *Spellbound*, Crusader Series, Vol. 10; (10) *Sabotage*, Crusader Series, Vol. 11; (11) *Alberto (Alberto Part One)*, Crusader Series, Vol. 12; (12) *Double Cross (Alberto, Part Two)*, Crusader Series, Vol. 13; (13) *The Godfathers (Alberto, Part Three)*, Crusader Series, Vol. 14; (14) *The Force (Alberto, Part Four)*, Crusader Series, Vol. 15; (15) *Four Horsemen (Alberto, Part Five)*, Crusader Series, Vol. 16. *See infra* note 8 for synopses of these publications.

7. The following Chick publications were being sent to the Committee: (1) *Reverend Wonderful;* (2) *Witnessing Effectively to Mormons;* (3) *Operation Bucharest*, Crusader Series, Vol. 1; (4) *The Last Missionary;* (5) *Who are They Gonna Remember;* (6) *The Big Betrayal*, Sword Series, Vol. 2. *See infra* Note 8 for a synopsis of *Operation Bucharest* and *The Big Betrayal*.

8. A synopsis of these publications, all of which espouse Christian theology, is as follows:

1. *King of Kings*, Sword Series, Vol. 1
Comic depiction of the Bible. It contains negative references to homosexuality and links it with the work of Satan.

2. *The Big Betrayal*, Sword Series Vol. 2
This comic book relates the life of Charles Chiniquy, a nineteenth century priest. It tells how "Rome" misinterprets scripture and was corrupt. The publication goes on to explain how Chiniquy came to the United States, met Abraham Lincoln, and how Lincoln defended Chiniquy against a lawsuit. As a result of his defense work, Lincoln was targeted for destruction by the Jesuits. It also states that "The Majority of the Roman Catholic Bishops are publicly for slavery." It concludes that Lincoln was killed as a result of a conspiracy of Jesuits in Rome.

3. *Operation Bucharest*, The Crusaders, Vol. 1
This comic book commences with a raid on a group of Christians in the USSR because of their worshipping together. It then shifts to the United States where two men are recruited to slip behind the iron curtain and deliver a microfilm, containing a Romanian translation of the Bible, to Bucharest. These two men, Tim Clark and Jim Carter, are the Crusaders. One of the Crusaders is the nephew of the U.S. Ambassador to France. A Soviet agent in the passport bureau notices that this individual is going to Bucharest, and notifies the KGB. The KGB chief then devises a plot to disgrace the Ambassador through his nephew. The plot was to have a female seduce the nephew and then expose the incident internationally. Instead of seducing him, the female KGB agent is converted to Christianity.

4. *The Broken Cross*, The Crusaders, Vol. 2
This publication begins with a female hitchhiker being drugged and sacrificed by a witches' coven as part of their religious ceremony. Tim Clark and Jim Carter appear upon the scene when the body is found. These are the same two characters introduced in "Operation Bucharest." The two begin an investigation into satanic activities in the area, and meet a girl. They convert her and stop the satanic cult.

5. *Scar Face*, The Crusaders, Vol. 3.
A British officer has a native boy horse whipped in East Africa in 1931. The boy, nicknamed "scar face", grows up to be president of the country. An agent of the People's Republic of China orders him to get rid of all the missionaries. When he does so, the Crusaders are sent to convert the president's rival. The story concludes with the president changing his mind about kicking out the missionaries.

**1542**

Eighteen of these publications were on the *Denied Publications* list for June 1988.[9]

On June 28, 1988, Lyon received a letter from Charles W. Lee, Deputy Director of Institutions, Iowa Department of Corrections, stating that the committee had approved his receiving the following six Chick publications: *Reverend Wonderful, Witnessing Effectively to Mormons, Operation Bucharest, The Big Betrayal, The Last Missionary,* and *Who Are They Gonna Remember.*[10] On June 30, 1988, Lyon filed an inmate grievance in which he sought to receive the remainder of the Chick publications he had ordered.

On July 5, 1988, Lyon received a response to his inmate grievance from Sgt. P.

6. *The Exorcists,* The Crusaders, Vol. 4.

The Crusaders are sent to India where a boy is possessed by the devil. They force the devil out of the boy by invoking Jesus' name. The book refers to the other gods in India as satanic.

7. *Chaos,* The Crusaders, Vol. 5.

Tim Clark and Jim Carter once again appear. In this issue they provide escort to a biblical historian as he travels to Israel. This publication concerns the Second Coming of Christ.

8. *Primal Man?,* The Crusaders, Vol. 6.

The plot of this comic is that the theory of evolution is incorrect. Notwithstanding, the theory is disseminated by the film industry because it is profitable.

9. *The Ark,* The Crusaders, Vol. 7.

Soviet communists find evidence of the existence of Noah's Ark. If found by Westerners it would destroy the communist conspiracy to discredit Christianity. A Western team goes to search for the Ark and is imprisoned. The Crusaders go to Turkey and after converting a Russian agent, free the archaeology team.

10. *The Gift,* The Crusaders, Vol. 8.

The Crusaders save a young woman after she attempts suicide. They then take her back to one of their girlfriend's apartments and tell her the story of Christ's life.

11. *Angel of Light,* The Crusaders, Vol. 9.

The Crusaders save a woman from serial killers and then convert her and her boyfriend. It points out that the Masons are part of a satanic plot to undermine Christianity.

12. *Spellbound,* The Crusaders, Vol. 10.

The message here is that rock music is the devil's music and therefore it should be destroyed. Additionally, there is an ongoing conspiracy by the producers of rock music and the media to further the devil's work.

13. *Sabotage,* The Crusaders, Vol. 11.

The story here is that of the "Alexandrian cult", which is attempting to dilute Christianity by substituting inferior Bibles for the King James Bible. In this publication, it is pointed out that the Roman Catholic Church used corrupted Bibles and allowed pagan statues in its churches. It is also asserted that the inquisition was a Catholic plot to acquire wealth.

14. *Alberto,* The Crusaders, Vol. 12 (Alberto Part One)

This and the other Alberto volumes purport to tell the story of Alberto Riveria, a former Jesuit priest. In 1979 he meets the Crusaders and tells them his life story. The book states that 86% of priests are under psychological or psychiatric treatment. It is also alleged that homosexuality is rampant in the priesthood and that secret burial sites exist on Catholic seminaries for the bodies of babies born of nuns and priests. The cause of death for these illegitimate children is usually suffocation. Alberto tells the Crusaders that he was trained to and did infiltrate Protestant churches in order to cause their destruction.

15. *Double-Cross,* The Crusaders, Vol. 13 (Alberto Part Two).

Continues the autobiography of Alberto. He relates how he went to London and saved his sister, a nun, from a nunnery. It is also alleged that the Roman Catholic Church ordered his execution and is behind the IRA. Additionally, the Jones massacre was ordered by Rome.

16. *The Godfathers,* The Crusaders, Vol. 14 (Alberto Part Three).

In this segment, Alberto tells the Crusaders that the Roman Catholic Church and the Jesuits created communism and Nazism, and both world wars.

17. *The Force,* The Crusaders, Vol. 15 (Alberto Part Four).

Alberto reveals the connection between the occult and the Catholic church.

18. *Four Horseman,* The Crusaders, Vol. 16 (Alberto Part Five).

Alberto relates his interpretation of revelation in which Pope John Paul II is the AntiChrist, and the Jesuits are the head of a world wide conspiracy.

19. *Who are They Gonna Remember, Reverend Wonderful,* and *The Last Missionary* (Ex. # 20).

Three short, pocket book size comics of gospel stories.

20. John L. Smith, *Witnessing Effectively To Mormons* (7th ed. 1989).

A how-to-book which instructs Christians on converting Mormons.

9. These eighteen listed publications that Plaintiff ordered were: *Alberto, Angel of Light, The Ark, The Big Betrayal, Broken Cross, Chaos, The Crusaders, Double Cross, The Exorcists, The Force, The Four Horsemen, The Gift, The Godfather, King of Kings, Primal Man?, Sabotage, Scarface,* and *Spellbound.*

10. Plaintiff received the publication *Operation Bucharest* on July 1, 1988, despite the fact that the comic book was listed on the June 1988, *Denied Publications* list, and was subsequently listed on the November 1988, *Denied Publications* list.

Wachtendorf in which she explained that, pursuant to policy, the publication review decisions were not subject to inmate grievances, but that Lyon could appeal to the committee. In a letter dated July 7, 1988, Lyon appealed the denial of the Chick publications to the committee. As of July 12, 1988, two members of the committee, John Sissel and Paul Hedgepeth, voted on a review form that seven of the Chick publications ordered by Lyon should be denied because they violated standard "A" and were deemed to be "Anti–Catholic literature, blatant bigotry, potentially disruptive." [11] The review form was returned to Grossheim after the committee had reviewed the publication.[12]

Lyon timely appealed the committee's decision denying him the Chick publications. Grossheim, in a letter dated July 28, 1988, affirmed the decision of the committee. As a result, Lyon was forced to send the rejected Chick publications to an attorney in Des Moines, Iowa. The *Denied Publications* list for November 1988, proscribed the same eighteen Chick publications as the June 1988 list. *See* supra note 9. Lyon filed the instant action on December 6, 1988.

On April 17, 1991, Chick Publications mailed to Lyon two packs of material, the "comic pack" and the "inmate information pack." On April 24, 1991, a notice of rejection of correspondence was issued to Lyon indicating that sixteen Chick publications had been rejected, and one publication was being referred to the committee.[13] On April 24, 1991, Lyon received the Chick publications *Operation Bucharest* and *The Force.* Lyon had previously been denied *The Force* in 1988.

Another inmate at ISP, Milton Weir, had ordered the same materials from Chick prior to Lyon's order. Weir's receipt of these materials was initially denied. On April 7, 1987, however, Grossheim, then Deputy Director of Institutions, informed Weir by letter that the committee had approved his receiving the Chick publications. On April 10, 1987, Weir received 18 Chick religious comic books, and two packets of booklets. Subsequently, Weir reordered additional religious comic books from Chick Publications. After these publications were initially rejected by correctional personnel, Weir was permitted to receive from Chick six religious booklets and the six religious comic books, *King of Kings, Operation Bucharest, Chaos, Primal Man?, The Ark,* and *The Gift.*[14]

Another inmate, Richard Lamphere, received the novel *Satanic Verses* by Salman Rushdie on April 27, 1989.[15] A copy of *Satanic Verses* is also available from the prison library.

The court finds no quantitative or qualitative differences between those religious comic books by Chick Publications which were approved by the Publication Review

**11.** These seven publications were *The Big Betrayal, Alberto, Double–Cross, The Force, Four Horsemen, The Godfathers,* and *Sabotage?*

**12.** There is no indication on the review form that Linda Robertson, the third member of the Publication Review Committee, reviewed the materials. Paul Hedgepeth initially voted to approve the Chick publications, but crossed out his initial approval and voted to deny the publications.

**13.** The publications denied to Plaintiff were the Crusader religious comic books volume two through fourteen, and sixteen. Additionally, one religious comic book, *The Prophet*, The Crusaders, Volume 17, was sent to the Committee for evaluation.

**14.** The rejection notice only listed five Chick religious comic books. This inconsistency was not explained at the trial.

**15.** The court is well aware of the international commotion created by the publication of *Satanic Verses.* *See generally* David Ferrell, *Nations Booksellers Battle Back in Face of Threats, Firebombings,* Los Angeles Times, Mar. 28, 1989, at 3 (detailing firebombing of bookstores which sold the book); Michiko Kakutani, *Telling the Truth through Fantasy; Rushdie's Magic Realism,* N.Y. Times, Feb. 24, 1989, at 30 (reviewing events following the release of the book); Edwin McDowell, *Furor Over "Satanic Verses" Rises as Two More Book Chains Halt Sales,* N.Y. Times, Feb. 18, 1989, at 1. The court finds, however, that there is no evidence of any disciplinary or security concerns resulting from inmates having access to and reading *Satanic Verses* at ISP.

Committee for dissemination to Lyon and those which were placed on the *Denied Publication* lists. The arbitrariness of the committee's decisions regarding which publications were to be permitted Lyon and those which were judged too combustible for the confines of ISP is demonstrated by the fact that the comic *The Big Betrayal* appears on the list of publications approved by the Publication Review Committee in the letter of June 28, 1988, and was also on the July 1988, list of publications which were to be denied Lyon. Furthermore, the arbitrariness of the review committee's decisions concerning the religious comic books by Chick Publications is also illustrated by the fact that Lyon was permitted one of the Alberto comics, *the Force*, but was denied the other five, even though the plots of the six Alberto comics are interrelated.[16]

Additionally, some of the comics which were denied to Lyon, such as the *Primal Man?* comic, do not contain any mention of the Catholic church, or anti-Catholic messages. Instead, the *Primal Man?* condemns the Hollywood film industry for making movies which promote the theory of evolution, rather than the creation theory. The plot of this religious comic book does not contain the type of polemic material which likely to cause disruption within ISP.

Paul Hedgepeth, Deputy Warden at ISP since 1972, testified that there has never been a problem at ISP with anti-Catholic sentiment among inmates creating a disciplinary or security problem. John Sissel, Deputy Warden of the Iowa Mens Reformatory at Anamosa, Iowa since 1972, testi-

fied he was unaware of any disciplinary or security problems at either ISP or Anamosa resulting from religious criticism of one inmate to another. The record is totally devoid of any evidence that religious criticism or religious discussions by inmates have ever created a disciplinary or security problem in any Iowa correctional facility. The court, as an ultimate finding of fact, specifically finds that none of the religious comic books by Chick Publications denied to Lyon are likely to cause disruptions within ISP if disseminated to inmates of that correctional facility.[17]

## III.   CONCLUSIONS OF LAW

### A.   Introduction

*1.   The Court's Role in Adjudicating Prisoner Constitutional Claims and the Proper Deference to be Given Prison Officials.*

■ While inmates lose many valued freedoms upon incarceration, they retain at least some of their constitutional rights during confinement. Therefore, at a minimum, prisoners are to be accorded behind the prison gate those rights not fundamentally inconsistent with imprisonment itself or incompatible with the objects of incarceration. *Turner v. Safley,* 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987); *Hudson v. Palmer,* 468 U.S. 517, 523, 104 S.Ct. 3194, 3198, 82 L.Ed.2d 393 (1984); *Timm v. Gunter,* 917 F.2d 1093, 1099 (8th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2807, 115 L.Ed.2d 979 (1991). Thus, "federal courts must take cognizance of the valid constitutional

---

**16.** The plot of the six religious comic books in the Alberto series concern a generalized scheme by the Roman Catholic Church for world domination and reviews the church's alleged involvement in historic world events such as World War II. The religious comic books in the Alberto series all claim to be based on the personal life and experiences of one Alberto Rivera, a former Jesuit priest. Each of the six religious comic books in the Alberto series assert on the inside cover of the publication that Dr. Rivera "is now fully involved in historical and Biblical research relating to the Roman Catholic institution and her associates according to Biblical prophecy." These publications also note on the

inside cover that Dr. Rivera "is available for preaching of the Gospel to the Roman Catholic people and for evangelistic campaigns, and when schedule allows, for speaking engagements in churches, schools, universities, and for lectures to government and government institutions in the United States and abroad."

**17.** The fourteen Chick comic books which have been denied to Plaintiff are: *King of Kings, The Broken Cross, Scar Face, Chaos, The Ark, Exorcist, The Gift, Primal Man?, Spellbound, Sabotage, Alberto, Double Cross, The Godfathers,* and *the Four Horsemen.*

claims of prison inmates." *Turner,* 482 U.S. at 84, 107 S.Ct. at 2259.

■ An equally important and co-extensive precept is that prisoners' constitutional rights may be significantly limited or substantially constrained in order to further legitimate objectives of the penal system. "Foremost among these objectives is internal security." *Gunter,* 917 F.2d at 1099 (citing *Hudson,* 468 U.S. at 524, 104 S.Ct. at 3199). Thus, when addressing an inmate's claim of alleged constitutional violations, such as those alleged by Lyons, federal courts "must consider whether the constrictions that prison administrators have placed on inmates' rights are justified by legitimate institutional concerns." *Gunter,* 917 F.2d at 1099. Federal courts must give great deference to the judgment exercised by prison administrators in attempting to strike a balance between the demands of institutional security and the constitutional rights of prisoners.[18]

> Such a balancing act is an exceedingly complex task, and not one easily undertaken by the courts, whose expertise in the imperatives of institutional security is slight and in no way approaches that of the professional administrators charged with the awesome task of running our prisons.

*Id.* at 1099.

The deference properly accorded to prison officials may not be minimized here simply because Lyon's claim involves access to religious literature from the "outside" world. *See Thornburgh v. Abbott,* 490 U.S. 401, 407, 109 S.Ct. 1874, 1878, 104 L.Ed.2d 459 (1989) (acknowledging the delicate balance between prison security and those on the "outside" seeking to enter the prison environment in person or through written correspondence). Many claims "to prison access undoubtedly are legitimate; yet prison officials may well conclude that certain proposed interactions, though seemingly innocuous to laymen, have potentially significant implications for the order and security of the prison." *Id.*

The deference owed to determinations of prison officials in the interest of security was recently observed by the United States Court of Appeals for the Eight Circuit. In *Falls v. Nesbitt,* 966 F.2d 375 (8th Cir. 1992), the court stated "[i]t is fundamental that prison administrators are accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 379 (citing *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979)).

■ This wide-ranging deference to the determinations of prison administrators is not boundless. "It is equally certain that '[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution.'" *Abbott,* 490 U.S. at 407, 109 S.Ct. at 1878 (quoting *Turner,* 482 U.S. at 84, 107 S.Ct. at 2259). Therefore, federal courts must discharge their duty to protect constitutional rights of prison inmates when a prison regulation or practice offends the fundamental constitutional guarantee. *Johnson v. Avery,* 393 U.S. 483, 486, 89 S.Ct. 747, 749, 21 L.Ed.2d 718 (1969); *Procunier v. Martinez,* 416 U.S. 396, 405–406, 94 S.Ct. 1800, 1807–08, 40 L.Ed.2d 224 (1974), *overruled in part by*

---

18. In *Turner,* the United States Supreme Court indicated that the deference to be accorded prison officials arrives in part from separation of powers principles:

> Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint.

*Turner,* 482 U.S. at 84–85, 107 S.Ct. at 2259. *See also Iron Eyes v. Henry,* 907 F.2d 810, 812 (8th Cir.1990) ("[I]ssues of prison management are, both by reason of separation of powers and highly practical considerations of judicial competence, peculiarly ill-suited to judicial resolution....") (citations omitted); *Lopez v. Robinson,* 914 F.2d 486, 490 (4th Cir.1990) (The United States Supreme Court "has persistently reminded lower courts that considerations of separation of powers and institutional competence suggest the need for judicial restraint....").

*Thornburgh v. Abbott,* 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989); *Turner,* 482 U.S. at 84, 107 S.Ct. at 2259.

With these general principles in mind, the court will now address the appropriate standard to be applied to Lyon's facial and as applied First Amendment challenges.

### 2. The Appropriate Standard of Review—The "Reasonable Relationship" Test.

This court's analysis of Lyon's First Amendment claims is governed by the Supreme Court's decisions in *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), and *Thornburgh v. Abbott,* 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989). A prison regulation that impinges on inmates' constitutional rights is valid "if it is reasonably related to legitimate penological interests." *Turner,* 482 U.S. at 89, 107 S.Ct. at 2261.[19] In adopting the "reasonable relationship" test, Justice O'Connor observed "[o]ur task ... is to formulate a standard of review for prisoners' constitutional claims that is responsive both to the 'policy of judicial restraint regarding prisoner complaints and [to] the need to protect constitutional rights.'" *Id.* at 85, 107 S.Ct. at 2259 (quoting *Martinez,* 416 U.S. at 406, 94 S.Ct. at 1808).

*Turner* opined the "reasonable relationship" test was necessary

> if "prison administrators ..., and not the courts, [are] to make the difficult judgments concerning institutional operations." Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously

hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration. The rule would also distort the decisionmaking process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand. Courts inevitably would become the primary arbiters of what constitutes the best solution to every administrative problem, thereby "unnecessarily perpetuat[ing] the involvement of the federal courts in affairs of prison administration."

*Id.,* 482 U.S. at 89, 107 S.Ct. at 2261–62 (citations omitted).

The "reasonable relationship" test articulated in *Turner* was applied in *Abbott* in upholding the facial validity of the Federal Bureau of Prison regulations restricting inmate access to certain publications.[20] *Abbott,* 490 U.S. at 404, 109 S.Ct. at 1876. In so holding, *Abbott* specifically limited the Court's earlier decision in *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). *Martinez* subjects the decisions of prison officials regarding censorship of inmates' incoming and outgoing correspondence to the "least restrictive means" test, *Id.* at 404–14, 94 S.Ct. at 1876–82, a less deferential approach than the reasonable relationship test. *Abbott* limited the use of the least restrictive means test to regulations governing outgoing correspondence only. *Abbott,* 490 U.S. at 413, 109 S.Ct. at 1881.[21]

---

**19.** The "reasonable relationship" test was crafted when reviewing constitutional challenges to two Missouri prison regulations. The court upheld the constitutionality of a Missouri Division of Corrections regulation that generally restricted correspondence between inmates at different institutions within the division's jurisdiction. *Turner,* 482 U.S. at 91–93, 107 S.Ct. at 2262–64. The second regulation prohibited inmates from marrying unless the prison superintendent had approved the marriage after finding there were compelling reasons for doing so. The court invalidated this regulation as unduly burdening the constitutional right to marry under *Zablocki v. Redhail,* 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978). *Id.* at 94–99, 107 S.Ct. at 2265–67.

**20.** In *Abbott,* the court was primarily concerned with regulations set forth at 28 C.F.R. §§ 540.70 and 540.71 (1988). "These generally permit an inmate to subscribe to, or to receive, a publication without prior approval, but authorize the warden to reject a publication in certain circumstances. The warden may reject it 'only if it is determined detrimental to the security, good order, or discipline of the institution or it if might facilitate criminal behavior.'" *Abbott,* 490 U.S. at 404, 109 S.Ct. at 1877 (citing 28 C.F.R. § 540.71(b)) (footnote omitted).

**21.** This court understands *Abbott* to have overruled *Martinez* only so far as the "least restrictive alternative" is no longer applicable to incoming mail. *Abbott,* 490 U.S. at 413–14, 109

In *Abbott*, the Court applied the "reasonable relationship" test rather than the less deferential approach in *Martinez* because the Court was concerned:

> that language in *Martinez* might be too readily understood as establishing a standard of "strict" or "heightened" scrutiny, and that such a strict standard simply was not appropriate for consideration of regulations that are centrally concerned with the maintenance of order and security within prisons. Specifically, the Court declined to apply the *Martinez* standard in "prisoners' rights" cases because, as was noted in *Turner, Martinez*

could be (and had been) read to require a strict "least restrictive alternative" analysis, without sufficient sensitivity to the need for discretion in meeting legitimate prison needs. The Court expressed concern that "every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand," and rejected the costs of a "least restrictive alternative" rule as too high.

*Abbott*, 490 U.S. at 409–11, 109 S.Ct. at 1879–80 (footnote and citations omitted).[22]

S.Ct. at 1881–82. *Abbott* stated that "we acknowledge today that the logic of our analysis in *Martinez* and *Turner* requires that *Martinez* be limited to regulations concerning outgoing correspondence." *Id.* Thus, this court does not understand *Abbott* to have completely overruled *Martinez*. This limitation on the court's prior holding in *Martinez* substantially altered existing case law among the lower federal courts. Indeed, each of the ten circuits that considered this issue, either before or after *Turner v. Safley*, had concluded or assumed that *Martinez* supplied the controlling standard for content based censorship of books, periodicals and newspapers mailed to prisoners. The ten circuits are as follows: First Circuit: *Dooley v. Quick*, 598 F.Supp. 607, 612 (D.R.I.1984), *aff'd*, 787 F.2d 579 (1st Cir.1986) (managers may limit expression pursuant to *Martinez*); Second Circuit: *Morgan v. LaVallee*, 526 F.2d 221, 224–25 (2d Cir.1975) (*Martinez* is controlling in cases involving censorship of prisoners' materials); Fourth Circuit: *Hopkins v. Collins*, 411 F.Supp. 831 (D.Md.1976), *aff'd in relevant part*, 548 F.2d 503, 504 (4th Cir.1977) (a full hearing requirement before censorship of a newspaper is not necessary to meet the procedural due process standards under *Martinez*); Fifth Circuit: *Guajardo v. Estelle*, 580 F.2d 748 (5th Cir.1978) (follows *Martinez* in prohibiting prison officials from censoring publications critical of their penal philosophy and their activities); Sixth Circuit: *Brooks v. Seiter*, 779 F.2d 1177 (6th Cir.1985) (prisoners claim that it was unconstitutional to prohibit them from receiving certain mail order publications was not frivolous when considered in light of *Martinez*); Seventh Circuit: *Aikens v. Jenkins*, 534 F.2d 751 (7th Cir.1976) (prison censorship regulations overbroad under *Martinez*); Eighth Circuit: *Valiant-Bey v. Morris*, 829 F.2d 1441, 1444 (8th Cir.1987) (reversed dismissal of claim that religious publications were intercepted and confiscated by prison officials in violation of the minimum procedural requirements set forth in *Martinez*); *Murphy v. Missouri Dep't of Corrections*, 814 F.2d 1252 (8th Cir.1987) (prison mail policy that operated as a

total ban on white supremacist material was overly restrictive under *Martinez*); Ninth Circuit: *Pepperling v. Crist*, 678 F.2d 787 (9th Cir.1982) (blanket prohibition against prisoners' receipt of nude pictures of wives and girlfriends and *Hustler* and *High Times* magazines is contrary to the least restrictive rule in *Martinez*); Eleventh Circuit: *Lawson v. Dugger*, 840 F.2d 781, 786 (11th Cir. 1987), *vacated*, 490 U.S. 1078, 109 S.Ct. 2096, 104 L.Ed.2d 658 (1989) (prohibition against Hebrew Israelite literature is overbroad under *Martinez*); District of Columbia Circuit: *Abbott v. Meese*, 824 F.2d 1166 (D.C.Cir.1987), (*Martinez* standards applicable to censorship of publications to which inmates subscribe), *vacated sub nom.*, *Thornburgh v. Abbott*, 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989).

**22.** *Abbott* was a 6–3 decision with Justices Stevens, Brennen and Marshall concurring in part and dissenting in part. Justice Stevens' opinion concurring in part and dissenting in part was particularly critical of the majority's opinion partially overruling *Martinez* by limiting its scope to outgoing mail and applying a reasonableness standard to incoming mail. Justice Stevens observed:

> This peculiar bifurcation of the constitutional standard governing communications between inmates and outsiders is unjustified.... The Court today abandons *Martinez's* fundamental premise. In my opinion its suggestion that three later opinions applying reasonable standards warrant this departure is disingenuous.

> The *Turner* opinion cited and quoted from *Martinez* more than 20 times; not once did it disapprove *Martinez's* holding, its standard, or its recognition of a special interest in protecting the First Amendment rights of those who are *not* prisoners. Notwithstanding, today the Court abandons the premise on which *Martinez* was grounded. This casual discarding of " 'the secure foundation' " of considered precedent ill serves the orderly development of the law.

In articulating the "reasonable relationship" test, the Court in *Turner* canvassed its earlier "prisoners' rights" cases,[23] and "identified several factors that are relevant to, and that serve to channel, the reasonableness inquiry." *Abbott*, 490 U.S. at 414, 109 S.Ct. at 1882. These four factors are: (1) whether there is a rational connection between the restriction and the legitimate governmental interest used to justify it; (2) whether alternative avenues of exercising the right remain open to the inmate; (3) whether accommodation of the right will have an adverse impact on guards, other inmates, and prison resources generally; and (4) whether obvious, easy alternatives to the restriction exist. *Turner*, 482 U.S. at 89–90, 107 S.Ct. at 2261–62; *Abbott*, 490 U.S. at 414–418, 109 S.Ct. at 1882–84[24]

■ In sum, the decisions by the United States Supreme Court in *Turner* and *Ab-* *bott* and the subsequent decisions by the United States Court of Appeals for the Eighth Circuit mandate that prison regulations that impinge on inmates' constitutional rights are valid if they are reasonably related to legitimate penological interests. It is in the context of this "reasonable relationship" test that Lyons' facial and as applied constitutional challenge to the restrictions on his receiving religious literature must be measured.

**B. Lyon's Constitutional Challenges to the Restrictions On His Receiving Religious Literature.**

*1. Lyon's Facial Constitutional Challenge.*

■ Lyon's facial constitutional challenge seeks to invalidate, on First Amendment grounds,[25] the administrative regula-

---

Abbott, 490 U.S. at 424–27, 109 S.Ct. at 1887–89. (citations omitted) (Stevens, J. concurring in part and dissenting in part).

23. The earlier "prisoners' rights" cases analyzed in *Turner* are *Martinez*, 416 U.S. at 396, 94 S.Ct. at 1800 (constitutional challenge to prison regulations relating to the censorship of prisoners' incoming and outgoing personal mail, and restricting access to prisoners by legal assistants and law students seeking to conduct attorney-client interviews); *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974) (constitutional challenge to a prison regulation prohibiting face-to-face media interviews with individual inmates); *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977) (constitutional challenge to prison regulations that prohibited meetings of a prisoners' labor union, inmate solicitation of other inmates to join the union, and bulk mailings concerning the union from outside sources); and *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (constitutional challenge to a Bureau of Prisons' regulation restricting inmates' receipt of hardback books unless mailed directly from publisher, book clubs or bookstores). *Turner*, 482 U.S. at 84–90, 107 S.Ct. at 2259–62.

24. Decisions of the United States Court of Appeals for the Eighth Circuit, subsequent to the Court's holdings in *Turner* and *Abbott*, have routinely applied these four factors and the "reasonably related to a legitimate penological interest" test to determine whether prison regulations impermissibly impinge on prisoners' constitutional rights. *See, e.g., Abdullah v. Gunter*, 949 F.2d 1032, 1035 (8th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1995, 118 L.Ed.2d 591 (1992) (inmate challenged prison

policy which prohibited prisoners from making religious donations); *Griffin v. Lombardi*, 946 F.2d 604, 607 (8th Cir.1991) (inmate brought action against prison officials for refusing to deliver his original diploma and transcripts); *Goodwin v. Turner*, 908 F.2d 1395, 1399 (8th Cir.1990) (inmate sought habeas corpus relief after denial of his request that he be permitted to artificially inseminate his wife); *Iron Eyes v. Henry*, 907 F.2d 810, 813 (8th Cir.1990) (Native American inmate sought relief against enforcement of rule requiring all prisoners to wear their hair above their collars); *Salaam v. Lockhart*, 905 F.2d 1168, 1170–71 (8th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 677, 112 L.Ed.2d 669 (1991) (inmate who changed his name after imprisonment challenged prison's "committed name" policy); *Blankenship v. Gunter*, 898 F.2d 625, 627 (8th Cir.1990) (inmate challenged prison policy which prohibited prisoners from making religious donations); *Smith v. Erickson*, 884 F.2d 1108, 1110 (8th Cir.1989) (inmate sought to have prison officials enjoined from enforcing prison-canteen-only-envelope policy, refusing to mail legal correspondence, and refusing to supply free postage and envelopes).

25. Interestingly, Grossheim's post-trial brief limits its First Amendment analysis solely to a free exercise claim. Grossheim argues that application of the *Turner* factors are unnecessary because "before the *Turner* analysis is applied, there must be a finding of a sincere religious belief and that a challenged regulation infringes upon that belief." Defendant's Proposed Findings of Fact and Conclusions of Law, p. 11. The court does not understand Lyon's First Amendment challenge to arise under the free exercise clause and, therefore, whatever Lyon's personal

tions that a publication may be denied to inmates at ISP if it "is likely to be disruptive or produce violence." [26] In *Abbott,* the court upheld the facial validity of administrative regulations promulgated by the Federal Bureau of Prisons which authorize rejection of a publication "only if it is determined detrimental to the security, good order, or discipline of the institution or if it might facilitate criminal activity." *Abbott,* 490 U.S. at 403, 109 S.Ct. at 1876. There is striking similarity between the Iowa regulations Lyon challenges and the regulations upheld in *Abbott.*[27]

For the reasons set forth below, the court concludes that Lyon's facial constitutional challenge is foreclosed by *Abbott* and must therefore fail. In reaching this conclusion, the court utilizes the four factors identified in *Turner* and *Abbott* that are used to guide the inquiry as to whether the regulation at issue "is reasonably related to legitimate penological interests." *Turner,* 482 U.S. at 89, 107 S.Ct. at 2261.

The first factor, "[t]he legitimacy of the Government's purpose in promulgating these regulations," is beyond question. *Abbott,* 490 U.S. at 415, 109 S.Ct. at 1882. The Department of Corrections' policy and the administrative regulation Lyon challenges are expressly aimed at protecting prison security, a purpose the United States Supreme Court has said is "central to all other correctional goals." *Abbott,* 490 U.S. at 415, 109 S.Ct. at 1882. Also, as far as neutrality, the regulations on their face further an important or substantial government interest—security—unrelated to the suppression of expression. *Martinez,* 416 U.S. at 413, 94 S.Ct. at 1811; *Abbott,* 490 U.S. at 415, 109 S.Ct. at 1882.

Where prison administrators "draw distinctions between publications solely on the basis of their potential implications for prison security, the regulations are 'neutral' in the technical sense in which we meant and used that term in *Turner.*" *Abbott,* 490 U.S. at 415–16, 109 S.Ct. at 1882–83 (footnote omitted).

The second *Turner* factor, whether there are alternative means of exercising the right which remain open to prison inmates, is also satisfied. This is because the regulations Lyon challenges "permit a broad range of publications to be sent, received and read...." *Id.* at 418, 109 S.Ct. at 1884.

The third factor under the *Turner* analysis is the impact the accommodation of the asserted constitutional right will have on others (guards and inmates) in the prison. *Turner,* 482 U.S. at 90, 107 S.Ct. at 2262; *Abbott,* 490 U.S. at 418, 109 S.Ct. at 1884. Here, the class of publications to be excluded is limited to those found "likely to be disruptive or produce violence" [28] or "a danger to the security or order of an institution or is detrimental to the rehabilitation of an inmate." [29] Because the right in question "can be exercised only at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike," *Turner,* 482 U.S. at 92, 107 S.Ct. at 2263, the court shall defer to the "informed discretion of correction officials." *Id.* at 90, 107 S.Ct. at 2262. Thus, the application of third factor supports the constitutionality of the regulations Lyon challenges.

Finally, the "existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Id.;*

---

religious beliefs are, they have no bearing on his First Amendment challenge.

**26.** Iowa Admin.Code r. 201–20.6(4)(a) (1989). *See supra* n. 2.

**27.** There is one major distinction. The regulations in *Abbott* precluded a warden from rejecting a publication "solely because its content is religious, philosophical, political, social or sexual, or because its content is unpopular or repugnant." 28 C.F.R. § 540.71(b); *Abbott,* 490 U.S. at 405, 109 S.Ct. at 1877. The Iowa regulations

Lyon challenges provide prison officials much greater latitude in excluding religious, philosophical, political, social, sexual, unpopular, or repugnant publications. Iowa regulations simply state that "no publication will be denied solely on the basis of its appeal to a particular ethnic, racial, religious or political group." Iowa Admin.Code r. 291–20.6(1) (1989).

**28.** Iowa Administrative Code 201–20.6(4)(a) (1989).

**29.** *Id.*

*Abbott,* 490 U.S. at 418, 109 S.Ct. at 1884. However, there is simply no evidence in the record to suggest that the regulations Lyon challenges—as distinguished from the individualized decisions to exclude specific literature—are on their face an "exaggerated response" to the institution's obvious problem of security and order.[30] Therefore, applying the reasonable relationship test of *Turner* and *Abbott,* and the factors relevant to the reasonableness inquiry, this court upholds the facial validity of the regulations which authorize denying to an inmate a publication that is likely to be disruptive or produce violence.[31]

### 2. Lyon's As Applied Constitutional Challenge.

#### a. Introduction.

■ Lyon also challenges the regulations as applied. While Lyon's facial constitutional challenge must fail under *Abbott,* the court concludes for the reasons set forth below, that Lyon's First Amendment rights, as the regulations were applied, have been violated.

Before turning to Lyon's as applied constitutional challenge, the court again notes the deference owed to the judgment of prison administrators in their attempts to strike a balance between institutional security and the constitutional rights of inmates. This deference, however, is not without limits. Federal courts' "prefatory declaration that prisoners retain certain basic constitutional rights has meaning." *Salaam v. Lockhart,* 905 F.2d 1168, 1171 (8th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 677, 112 L.Ed.2d 669 (1991). The substantial deference accorded prison officials does not relieve federal courts from their duty to "make sure after an independent review of the evidence that the regulation is not an exaggerated response to prison concerns." *Id.* (citing *Abbott,* 490 U.S. at 416–19, 109 S.Ct. at 1883–84); *Turner,* 482 U.S. at 96–99, 107 S.Ct. at 2265–67.

Furthermore, "[w]hile we may not invalidate a regulation because we can imagine a more refined one, constitutional rights should be accommodated." *Salaam,* 905 F.2d at 1171. Thus, federal courts must not uphold "prison regulations that are clearly broader in their scope or significantly more burdensome in effect than reasonable alternatives." *Id.*

Two observations concerning the role of the First Amendment in prisons are important. First, the inclination to silence expression in the context of prisons is an enduring tendency which experience teaches us, is pervasive and recurrent. Second, First Amendment guarantees taken for granted in the outside world assume greater significance in the context of prison life. These concerns are discussed more fully below.

"All government displays an enduring tendency to silence, or to facilitate silencing, those voices that it disapproves." *Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 235, 107 S.Ct. 1722, 1730, 95 L.Ed.2d 209 (1987) (Scalia, J., dissenting). This tendency may be particularly pronounced in prison because of its authoritarian structure, insularity, and isolation from public scrutiny and the mainstream of civilian life. "Prisons are too often shielded from public view ..." *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 358, 107 S.Ct. 2400, 2409, 96 L.Ed.2d 282 (1987) (Brennan, J., dissenting). In prison, therefore, the danger is especially great that censors will attempt "to eliminate unflattering or unwelcome opinions" *Martinez,* 416 U.S. at 413, 94 S.Ct. at 1811, and "to apply their own personal prejudices and opinions...." *Id.* at 415, 94 S.Ct. at 1812. Indeed, *Martinez* explicitly acknowledged this danger, observing that "some prison officials used the extraordinary latitude for discretion authorized by the regulations to suppress un-

---

**30.** Following the U.S. Supreme Court's decision in *Abbott,* lower federal courts have frequently upheld security based prison regulations against First Amendment facial challenges. *See, e.g., Thomas v. United States Secretary of Defense,* 730 F.Supp. 362 (D.Kan.1990) (regulation autho-

rizing officials to reject incoming mail that might be disruptive not facially violative of first amendment).

**31.** Iowa Administrative Code 201–20.6(4)(a) (1989).

welcome criticism." *Id.*[32.] In that case, prison censors vainly attempted to justify excluding letters " 'criticizing policy, rules or officials,' " " 'belittling staff or our judicial system or anything connected with the Department of Corrections,' " or containing " 'disrespectful comments,' 'derogatory remarks,' " or statements that " 'unduly complain or magnify grievances.' " *Id.*

Time and again, one finds that the banned publications do not advocate criminal behavior or prison disruption, are not obscene, and do not instruct bomb-building, liquor-brewing, lock-picking, escape-planning or other dangerous activities. Rather, they express the views of racial, religious, political and sexual minorities or contain information and opinion negatively reflecting on authority figures or prison officials. Case law is replete with examples of overbroad censorship.[33] In addition to its potential to sweep too broadly, prison censorship is occasionally absurd.[34]

Also of significant importance is the unique and special role the First Amendment assumes in the prison environment. In a very real sense, the First Amendment guarantees taken for granted in the free world assume far greater significance in the total isolation of prison life. Both federal courts and commentators have recognized this.

> The simple opportunity to read a book or write a letter, whether it expresses political views or absent affections, supplies a vital link between the inmate and the outside world, and nourishes the prisoner's mind despite the blankness and bleakness of his environment.

*Wolfish v. Levi*, 573 F.2d 118, 129 (2d Cir. 1978), *rev'd sum nom., Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

> When the prison gates slam behind an inmate, he does not lose his human quality; his mind does not become closed to ideas; his intellect does not cease to feed on a free and open interchange of opinions; his yearning for self-respect does not end; nor is his quest for self-realization concluded. If anything, the needs for identity and self-respect are more compelling in the dehumanizing prison environment.... It is the role of the First Amendment and this Court to protect those precious personal rights by which we satisfy such basic yearnings of the human spirit.

---

**32.** *Cleavinger v. Saxner*, 474 U.S. 193, 204, 106 S.Ct. 496, 502, 88 L.Ed.2d 507 (1985), acknowledged a similar danger, noting that prison discipline committee members are "under obvious pressure to resolve a disciplinary dispute in favor of the institution and their fellow employee."

**33.** *Guajardo v. Estelle*, 580 F.2d 748, 760 (5th Cir.1978) (prison officials sought to ban material advocating "prisoner rights" such as The Penal Digest International, published by the Fortune Society); *Aikens v. Jenkins*, 534 F.2d 751, 754 (7th Cir.1976) (local prison policies were interpreted to exclude Dostoevski's *The Gambler*, Gibran's *The Prophet*, and all publications of Bantam Books); *Jackson v. Godwin*, 400 F.2d 529, 530–31 (5th Cir.1968) (*Ebony, Sepia, Pittsburgh Courier*, and *Amsterdam News* which are published primarily for black readers were banned; magazines were restricted to *U.S. News and World Report, Sports Illustrated, Reader's Digest, National Geographic, Outdoor Life, Saturday Evening Post*, and *Pocket Crossword Puzzles*); *Lawson v. Wainwright*, 641 F.Supp. 312, 316–17 (S.D.Fla.1986) (Hebrew Israelite publications including a dietary manual and historical accounts of lynching of blacks banned by prison officials); *McMurry v. Phelps*, 533 F.Supp. 742, 765 (W.D.La.1982), *overruled on other grounds*

by *Thorne v. Jones*, 765 F.2d 1270 (5th Cir.1985) (censorship of *Life Magazine* not justified by government interest); *Aikens v. Lash*, 390 F.Supp. 663, 671 (N.D.Ind.1975), *aff'd sub nom., Aikens v. Jenkins*, 534 F.2d 751 (7th Cir.1976) (quotations of Chairman Mao Tse–Tung censored because it was written by a communist); *Laaman v. Hancock*, 351 F.Supp. 1265, 1269 (D.N.H.1972) (writings of Karl Marx and successors which draw on world history and economic theory as they relate to the socialist movement censored); *Fortune Society v. McGinnis*, 319 F.Supp. 901, 903 (S.D.N.Y.1970) (prisoners not allowed to receive the Fortune Society newsletter without justification by prison officials).

**34.** One New York prison deemed all maps to present risks of escape and, pursuant to this edict, maps of the Moon and other planets were removed from the prison library. Amicus Curiae Brief of the Correctional Association of New York, at 13 n. 14, *Thornburgh v. Abbott*, 490 U.S. 401, 109 S.Ct. 1874. In a Wisconsin prison, pursuant to a ban on material about making weapons, inmates were forbidden to receive an issue of the Progressive containing an article about the hydrogen bomb. *Id.*

*Martinez,* 416 U.S. at 428, 94 S.Ct. at 1818. (Marshall, J., concurring).

> Incarceration by its nature denies a prisoner participation in the larger human community. To deny the opportunity to affirm membership in a spiritual community, however, may extinguish an inmate's last source of hope for dignity and redemption.

*O'Lone,* 482 U.S. at 368, 107 S.Ct. at 2414. (Brennan, J., dissenting) (footnote omitted).

> An inmate's conscience is no less inviolable than that of an unconfined citizen, and a violation could well work an even greater harm upon the inmate, whose means of spiritual recovery are limited by the prison environment.

Comment, *Religious Rights of the Incarcerated,* 125 U.Pa.L.Rev. 812, 853–54 (1977).

Mindful of the deference properly accorded to prison officials' determinations, and the role of the First Amendment in prisons, the court turns to Lyon's as applied challenge.

### b. Application of the "Reasonable Relationship" Test to Lyons as Applied Constitutional Challenge.

Similar to a facial challenge, the starting point for Lyon's as applied First Amendment constitutional challenge to restriction on his receiving religious literature is the reasonable relationship test of *Turner* and *Abbott* and the four *Turner* factors to guide the court's reasonableness inquiry. Because the *Turner* factors were developed in the context of facial constitutional challenges, they may or may not lend themselves to an "as applied" analysis, depending on the facts and circumstances of any given case. Accordingly, the court will address those factors most applicable and helpful to its analysis. *See Skelton v. Pri-Cor, Inc.,* 963 F.2d 100, 103 (6th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1682, 118 L.Ed.2d 398 (1992) (determinative and only factor considered by the court in its reasonableness inquiry of the regulation as applied was whether alternative means of exercising the right remained open to the inmate).

Turning to the first *Turner* factor, the court must determine whether the objective underlying the regulations is legitimate, and whether the regulations are rationally related to that objective. The court concludes that the regulations, as applied to the publications Lyon sought to receive, do not rationally advance a legitimate government interest.

ISP officials proffered "likely to be disruptive or produce violence" as the prison standard for denying Lyon the religious comic books published by Chick Publications. As previously noted, security is a valid penological interest. However, on this record, the court cannot conclude that possession of the religious publications at issue poses a potential or conceivable threat to prison security. Rather, the court finds the officials' security concerns to be both exaggerated, *see Iron Eyes v. Henry,* 907 F.2d 810, 820–21 (8th Cir.1990) (Heaney, J., dissenting), and speculative. *Whitney v. Brown,* 882 F.2d 1068, 1074–78 (6th Cir.1989).

There is no evidence that Lyon has ever caused a security problem resulting from his possession of religious publications. There is also no evidence of past confrontations as a result of other inmates possessing or reading religious publications. On four occasions testimony similar to the following was elicited from two prison officials on the publication review committee:

> Q: [L]et's assume for purposes of discussion that that publication is, in fact, blatantly anti-Catholic. Could you state for me how many disciplinary matters that you had had at the institution, the Iowa State Penitentiary, as of 6–9–88 that were the result of literature received by inmates that were blatantly anti-Catholic?

> A: I couldn't say specifically. I don't have any special recall of it, and as you know we have literally thousands of misconduct written for all kinds of reasons, but oftentimes the reason is not the actual reason, any more than a sentence of the inmate at the prison really says what he did.

Q: So I understand, at this time you cannot recall any specific incident where an inmate had disciplinary problems because of being in possession of or reading anti-Catholic literature?

A: No, I can't say that I can recall that.

Trial Tr. at 66–67.

The absence of a security problem is not due to prison officials effectively keeping restricted religious publications out of the institution. To the contrary, inmate Weir testified that he had religious comic books published by Chick Publications in his possession that were on the *Denied Publications* list. In addition, Weir received some of the same Chick religious comic book publications as those denied to Lyon. There was no resulting security disruption.[35] The court is not suggesting that a security disruption must occur before the officials' alleged security concerns will be deemed reasonable. However, mere declarations and incantations that a practice might be harmful to prison order, in the complete absence of a rational, reasonable basis cannot justify government suppression of constitutionally protected religious publications. "The fact remains ... that prison officials do not set constitutional standards by fiat." *Whitney*, 882 F.2d at 1074. More importantly, ISP Deputy Warden Paul Hedgepeth specifically testified that to his knowledge (he has been Deputy Warden at ISP since 1972 and has been employed at ISP for 28 years) there has never been any disciplinary incidents, acts of misconduct or other incidents raising security concerns involving anti-Catholic sentiment between or among inmates at ISP. John Sissel, Deputy Warden at the Men's Reformatory (since 1972) in Anamosa, Iowa, testified that to his knowledge, there has never been a problem in the penal institutions in Iowa regarding religious criticism of one inmate to another.

Nor is the court suggesting that absence of a security problem, standing alone, conclusively establishes the unreasonableness of the regulations as they were applied. *Turner* requires this court to examine additional factors when evaluating an as applied constitutional challenge, and the court will proceed to do so. Nevertheless, under the first *Turner* factor, there is no evidence connecting the regulation, as it was applied, to a valid security concern. The prison officials' actions, including Grossheim's, in suppressing the religious comic books published by Chick Publications, represent an exaggerated response to a totally speculative perceived security risk.

Turning to the second *Turner* factor, it appears Lyon had no alternative means of obtaining the restricted reading material. *See Jackson v. Elrod*, 881 F.2d 441, 445 (7th Cir.1989) (determinative factor was that the inmate had no alternate source for literature addressing his alcohol problem). Each publication presents a unique view of various religious topics. Because a publication is denied based on subjective opinions of prison officials, publications presenting similar views are likely to be denied as well.

The third *Turner* factor requires the court to address "the impact accommodation of the asserted constitutional right will have on guards and other inmates...."

---

**35.** The lack of disruptions or other adverse consequences when some of the censored publications at issue were permitted in to ISP is not surprising. As was pointed out in one of the amicus curiae briefs in *Abbott*, the overbreadth of prison censorship has been demonstrated formerly censored publications have been given to inmates. *See* Amicus Curiae Brief of The Correctional Association of New York at 9 n. 19, *Abbott*, 490 U.S. 401, 109 S.Ct. 1874 [hereinafter *Amicus Curiae* ]. For example, as a result of the litigation in *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1024 (2d Cir.1985), inmates were permitted to receive a report on the conditions at Attica. No reports of adverse consequences followed dissemination of that report. *Amicus Cu-*

*riae* at 9 n. 19. Similarly, during the litigation in *Jackson v. Ward*, 458 F.Supp. 546 (W.D.N.Y. 1978), prison officials abandoned their censorship claims as to 51 publications without adverse reaction. *Amicus Curiae* at 9 n. 20. It was likewise noted by respondents in *Abbott* that through that case's fifteen year litigation history petitioners "ha[d] been unable to cite a single incident in which a threat to security was linked to a publication received by a federal prisoner." Brief for Respondents at 10, *Abbott*, 490 U.S. 401, 109 S.Ct. at 1874. Also, respondents observed that petitioner's sole outside corrections expert was unable to cite any adverse incident caused by an inmate's reading of an article. *Id.*

*Turner,* 482 U.S. at 90, 107 S.Ct. at 2262; *Abbott,* 490 U.S. at 418, 109 S.Ct. at 1884. The court has previously determined the publications at issue are not potentially threatening to prison security. Therefore, the "ripple effect" which concerned the Court in *Turner* is not a viable concern here. While it is true that some inmates might seize any opportunity to cause trouble, it is not apparent why allowing Lyon to possess the restricted material would cause an increase in the incidence of violence. Furthermore, if rights "could be sacrificed in fear of those who would cause trouble under any regime, officials could ignore any individual right." *Salaam,* 905 F.2d at 1175.

Finally, under the fourth *Turner* factor, the court finds further support for its conclusion that the regulations, as applied here, is an exaggerated response to the alleged prison concerns. This factor requires the court to explore whether obvious, easy alternatives to the restriction exist. "[T]he existence of [such] alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Turner,* 482 U.S. at 90, 107 S.Ct. at 2262. One obvious alternative would be to restrict the reading material to the inmate's cell. Another would be to designate a specific room, such as a library, to house and catalogue the material so its dissemination could be controlled. The court is not suggesting either alternative is necessary, particularly in light of its finding that the restricted publications are not detrimental to prison security.

The court also finds that the prison officials acted arbitrarily when denying Lyon the religious publications. Mr. Hedgepeth could neither cite a single reason why any of the publications failed the prison standard nor identify what contents of the publications were likely to be disruptive or produce violence. Mr. Sissel subjectively characterized *The Big Betrayal* as being anti-Catholic and promoting "religion bashing," yet he failed to indicate what portions of the publications fit that characterization or were likely to encourage violence.[36]

Areas were provided on the committee's review forms to indicate what specific portions of the publications were deemed unacceptable. These areas were blank. "We just didn't do it" was the explanation given by one prison official for failing to complete the forms. Thus, while Lyon received notification of rejection and had the opportunity to object, it was not a meaningful opportunity. Lyon could only speculate as a result of the committee failing to identify what portions of the publications failed to meet the prison standard.

The court has conducted an independent review of the denied publications, and has failed to find a single publication whose content could even remotely be said to be disruptive or produce violence. Moreover, the court specifically finds that the religious literature at issue here is much less subject to a legitimate penological interest than the literature containing racist views and advocating racism or racial purity held constitutionally protected in the prison context in *McCabe v. Arave,* 827 F.2d 634, 638 (9th Cir.1987). In that case, the court held:

> Given the strength of First Amendment protection for freedom of belief prison authorities have no legitimate penological interest in excluding religious books from the prison library merely because they contain racist views. Courts have repeatedly held that prisons may not ban all religious literature that reflects racism.

*McCabe,* 827 F.2d at 638 (citations omitted).

Any finding that the religious publications at issue here would likely lead to disruption in the prison is, "on this record, the piling of conjecture upon conjecture." *Reed v. Faulkner,* 842 F.2d 960, 963 (7th Cir.1988).[37] In *Williams v. Lane,* 851 F.2d

---

**36.** It must be noted that Lyon received this publication, yet no problems occurred as a result of its presence at ISP.

**37.** In *Reed,* the United States Court of Appeals for the Seventh Circuit vacated and remanded the district court's entry of judgment for prison officials. The issue in *Reed* involved the enforcement of a prison regulation prohibiting male inmates from wearing hair that touched their collar. Reed alleged that this regulation

867, 886 (7th Cir.1988), *cert. denied,* 488 U.S. 1047, 109 S.Ct. 879, 102 L.Ed.2d 1001 (1989) the United States Court of Appeals for the Seventh Circuit, in affirming the district court's findings of substantial constitutional violations observed:

> Courts must of course recognize their limited competence in the troubled and complicated area of prison administration. However, prison administrators alleged to have violated inmates' rights must meet such challenges with edifying and illuminating rejoinders drawn from their unique expertise, not with the modest responses advanced in this litigation.

*Lane,* 851 F.2d at 886 (Flaum, J., concurring). Here, Lyon's constitutional challenge was hardly met with "edifying and illuminating rejoinders." Rather, the prison officials relied solely on subjective conjecture and speculative concerns totally lacking a factual basis in this record.

Either under the four *Turner* factors which channel the reasonableness inquiry— or under the reasonable relationship test itself, the court finds that the regulations at issue, as applied, are not reasonably related to a legitimate penological interest. As such, the application of these regulations to the religious literature at issue violate Lyon's constitutional rights under the First Amendment of the United States Constitution.

### C. Respondeat Superior.

[8] The court need not tarry on Grossheim's initial argument that Lyon is seeking to impose supervisory liability based on respondeat superior. It is axiomatic that "[r]espondeat superior is not applicable to § 1983 claims." *Ouzts v. Cummins,* 825 F.2d 1276, 1277 (8th Cir.1987) (citing *Cotton v. Hutto,* 577 F.2d 453, 455 (8th Cir. 1978)); *H.C. ex rel. Hewett v. Jarrard,* 786 F.2d 1080, 1086 (11th Cir.1986). However, supervisory liability may be established if Lyon can demonstrate corrective inaction amounting to "deliberate indifference or " 'tacit authorization of the offensive [practices].' " " *Williams v. Willits,* 853 F.2d 586, 588 (8th Cir.1988) (citations omitted). In other words, "[s]upervisory liability occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation." *Brown v. Crawford,* 906 F.2d 667, 671 (11th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 2056, 114 L.Ed.2d 461 (1991).

Turning to the facts of this case, Grossheim's connection with the actions underlying this lawsuit is not merely that he is the head of the Department of Corrections, but rather that he is one of the actual actors who deprived Lyon of the Chick publications. Grossheim either knew or should have known that these publications had been permitted into the institution previously. *See* Ex. # 1. It was Grossheim's determination to uphold the decision of the publication review committee and deny Lyon access to these magazines. Pursuant

---

infringed his religious liberty to wear shoulder-length "dreadlocks" as a Rastafarian. The court in rejecting the prison officials' conjecture regarding the likelihood of racial violence held:

> Whatever the ultimate merits of Reed's challenge, which may well be slight, the district judge's findings raise two serious problems. One concerns the finding about the danger of racial conflict posed by the Rastafarian belief that blacks are superior to whites. No evidence of such a danger was presented, and in any event it is not easy to see how forcing Rastafarians to cut their hair is going to change this belief. One prison administrator testified "that a person who is wearing the symbol of the dreadlock might indeed be wearing something as a symbol" that blacks are superior to whites, and apparently it was this testimony that became transmogrified in the district court's opinion into "a security concern for potential racial conflict from the professed Rastafarian belief that dreadlock symbolizes black superiority." Actually there was no evidence that the dreadlock symbolizes black superiority, as distinct from being a conspicuous outward manifestation of Rastafarianism, a faith that does teach black superiority; however, as such a manifestation it might remind white inmates of the Rastafarian belief in black superiority. Yet this is pure conjecture, and to suppose that the wearing of dreadlocks would lead to racial violence is, on this record, the piling of conjecture upon conjecture.

*Reed,* 842 F.2d at 963. This is precisely the type of pure speculation and conjecture that forms the sole basis for the suppression of the religious literature sought to be obtained by Lyon here.

to Iowa Administrative Code r. 291–20.6(7), Grossheim's decision on appeals of the publication review committee was the final word on the matter.

The situation here is inapposite to that discussed in *Ouzts*, 825 F.2d at 1277, where the defendant's only connection to the alleged constitutional violation was that he was the warden of the correctional facility which housed the plaintiff. Here, Grossheim was apprised of the situation via Lyon's appeal to him. He had the authority to override the publications review committee's decision and permit Lyon to have the publications. Therefore, because Grossheim personally participated in the alleged constitutional violation, and there is a direct causal connection between his actions and the alleged constitutional violations, a viable claim of supervisory liability has been established by Lyon. *See H.C. ex rel. Hewett*, 786 F.2d at 1087.

### D. Relief.

■ The court must determine the appropriate relief for Lyon. "In Section 1983 cases, prisoners may receive remedies comparable to all civil litigants." *Lane*, 851 F.2d 867, 885. Lyon seeks declaratory and injunctive relief, as well as compensatory and punitive damages, and attorney fees.

In shaping equitable relief, "the trial court is vested with broad discretionary power.... Moreover, in constitutional adjudication as elsewhere, equitable remedies are a special blend of what is necessary, what is fair, and what is workable." *Lemon v. Kurtzman*, 411 U.S. 192, 200, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1973) (footnote omitted). Pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, this court "has the duty to decide the appropriateness and the merits of the declaratory request irrespective of its conclusion as to the propriety of the issuance of the injunction." *Steffel v. Thompson*, 415 U.S. 452, 468, 94 S.Ct. 1209, 1220, 39 L.Ed.2d 505 (1974). For the reasons set forth above, this court has determined that Lyon's First Amendment rights have been violated by Grossheim's denial to Lyon of the Chick religious comic book publications. Accordingly, Lyon is entitled to a declarato-

ry judgment that Grossheim has violated his First Amendment rights.

The principles governing injunctive relief are well established. "A federal court possesses broad powers to remedy constitutional violations, but these powers are not boundless." *Al–Alamin v. Gramley*, 926 F.2d 680, 685 (7th Cir.1991). A federal court may exercise its remedial power "only on the basis of a constitutional violation." *Swann v. Board of Education*, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971); *accord Johnson v. Boreani*, 946 F.2d 67, 72 (8th Cir.1991). The petitioner must prove that the violation is ongoing in nature or likely to recur. *See Green v. Mansour*, 474 U.S. 64, 71, 106 S.Ct. 423, 427, 88 L.Ed.2d 371 (1985); *Johnson*, 946 F.2d at 72. If the petitioner successfully establishes such a violation, the "nature and extent of the constitutional violation determines the remedy." *Milliken v. Bradley*, 418 U.S. 717, 744, 94 S.Ct. 3112, 3127, 41 L.Ed.2d 1069 (1974) (citing *Swann*, 402 U.S. at 16, 91 S.Ct. at 1276). Finally, "[w]hile the remedy must be narrowly tailored," the court retains discretion to construct its remedial decree. *United States v. Paradise*, 480 U.S. 149, 184, 107 S.Ct. 1053, 1073, 94 L.Ed.2d 203 (1987). With these principles in mind, the court determines that Lyon is entitled to appropriate injunctive relief to remedy the ongoing constitutional violation regarding the religious publications at issue. The denial of the religious publications at issue constitutes ongoing irreparable injury to Lyon. "The loss of First Amendment freedoms for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976); *Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir.1989). Defendant Grossheim's successor is hereby enjoined from denying Lyon the Chick publications at issue in this litigation. This narrowly tailored injunction avoids the caveat that the entry of unnecessary or overbroad injunctions would " 'leave too little discretion in the hands of prison officials who must deal with the very difficult issues of security within their institutions.' " *Johnson v. Boreani*, 946 F.2d 67, 72 (8th

Cir.1991) (quoting *Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir.1982)).

■ Lyon claims both compensatory and punitive damages. "In a section 1983 action, both compensatory and punitive damages are available upon proper proof." *Cunningham v. City of Overland*, 804 F.2d 1066, 1069 (8th Cir.1986). The United States Supreme Court has repeatedly observed that 42 U.S.C. § 1983 was intended to create " " 'a species of tort liability' in favor of persons who are deprived of 'rights, privileges or immunities secured' to them by the Constitution." " *Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 305–06, 106 S.Ct. 2537, 2542, 91 L.Ed.2d 249 (1986) (quoting *Carey v. Piphus*, 435 U.S. 247, 253, 98 S.Ct. 1042, 1047, 55 L.Ed.2d 252 (1978), quoting *Imbler v. Pachtman*, 424 U.S. 409, 417, 96 S.Ct. 984, 988, 47 L.Ed.2d 128 (1976)); *see also Smith v. Wade*, 461 U.S. 30, 34, 103 S.Ct. 1625, 1628, 75 L.Ed.2d 632 (1983); *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 258–59, 101 S.Ct. 2748, 2755–56, 69 L.Ed.2d 616 (1981). Thus, when a § 1983 plaintiff "seeks damages for violations of constitutional rights, the level of damages is ordinarily determined according to principles derived from the common law of torts." *Stachura*, 477 U.S. at 306, 106 S.Ct. at 2542. "Generally, compensatory damages should attempt to place the plaintiff in a position similar to the one she or he would have been in had the violation not occurred." *City of Overland*, 804 F.2d at 1069. Unlike compensatory damages, "[t]he purpose of punitive damages is to punish the defendant for his willful or malicious conduct and to deter others from similar behavior." *Stachura*, 477 U.S. at 306 n. 9, 106 S.Ct. at 2543 n. 9.

For the two independent reasons set forth below, the court determines that Lyon is not entitled to either compensatory or punitive damages. The complaint does not specify whether Grossheim is being sued in his official capacity or individual capacity. The United States Court of Ap-

peals for the Eighth Circuit has indicated that a party wishing to sue an individual in both their individual and personal capacity should so specify in their pleadings. *See Nix v. Norman*, 879 F.2d 429, 431 (8th Cir.1989). Since the pleadings in this case refers to Grossheim's job title, a presumption is created that Grossheim is being sued in his official capacity only. *See Kolar v. County of Sangamon*, 756 F.2d 564, 568 (7th Cir.1985). The court, therefore, finds that Lyon has brought suit against Grossheim in his official capacity only. The significance of this fact is that the Eleventh Amendment prohibits the imposition of monetary damages against the state. Therefore, Lyon's claim for monetary damages in this suit is barred by the Eleventh Amendment. *Edelman v. Jordan*, 415 U.S. 651, 663, 94 S.Ct. 1347, 1352, 39 L.Ed.2d 662 (1974); *Norman*, 879 F.2d at 432.[38]

Alternatively, even were the court to indulge Lyon and assume that he had sued Grossheim in his individual capacity, the record evidence fails to establish that Lyon has suffered actual damages as a result of Grossheim's actions here. Damages may not be presumed for a constitutional violation. *See Stachura*, 477 U.S. at 309–10, 106 S.Ct. at 2544–45.

■ Lyon is a prevailing party within the meaning of the Civil Rights Attorney Fees Award Act of 1976, 42 U.S.C. § 1988. *See generally, Texas State Teachers Ass'n v. Garland Indep. School Dist.*, 489 U.S. 782, 793, 109 S.Ct. 1486, 1494, 103 L.Ed.2d 866 (1989) ("They prevailed on a significant issue in the litigation and have obtained some of the relief they sought and are thus 'prevailing parties' within the meaning of § 1988."). Indeed, it is clear that statutory attorney fees awarded under 42 U.S.C. § 1988 are part of the "arsenal of remedies to combat violations of civil rights." *Evans v. Jeff D.*, 475 U.S. 717, 732, 106 S.Ct. 1531, 1540, 89 L.Ed.2d 747 (1986). Lyon and his counsel are, therefore, entitled to an award of reasonable attorney fees and costs. *See Local Rule of Court* 22.

**38.** The Eleventh Amendment, of course, does not bar Lyon from obtaining injunctive relief. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 n. 10, 109 S.Ct. 2304, 2311 n. 10, 105 L.Ed.2d 45 (1989); *Norman*, 879 F.2d at 432.

**1558**

### IV. CONCLUSION

The Iowa administrative regulations which allow the censoring of publications which are likely to be disruptive or produce violence at ISP are facially constitutional. They are reasonably related to the legitimate penological interest of institutional security. However, Lyon was denied his rights under the First Amendment of the United States Constitution by the denial of the religious comic books published by Chick Publications at issue here. This denial was unaccompanied by a legitimate penological interest. The record evidence is totally devoid of any rational explanation as to why the religious comic books would likely be disruptive. Only pure conjecture supports the suppression of the religious comic books published by Chick Publications. Prison officials must ordinarily be afforded wide-ranging deference in promulgating and implementing restrictions on inmates. The court should yield to these official determinations regarding the necessity and propriety of such limitations. However, this is one of those rare cases where deference to prison officials must yield to constitutional mandate. Deferring to prison officials on this record of pure conjecture would allow the mere assertion and incantation of security to provide an unreviewable basis for governmental suppression of passive religious reading material. This would effectively grant these prison officials an unrestrained veto over the First Amendment. This, the United States Constitution does not allow.

### V. ORDER FOR JUDGMENT

For the reasons set forth above, the court concludes that Lyon is entitled to a declaratory judgment, appropriate injunctive relief and reasonable attorney fees. Defendant Grossheim's successor is hereby enjoined from denying Lyon the Chick publications at issue in this case. It is ordered that judgment be entered accordingly.

IT IS SO ORDERED.