**Harry WHITNEY, et al.**
**Plaintiffs–Appellees,**
**Cross–Appellants,**

**v.**

**Robert BROWN, et al.**
**Defendants–Appellants,**
**Cross–Appellees.**

**Nos. 88–1308, 88–1399.**

United States Court of Appeals,
Sixth Circuit.

Argued May 23, 1989.

Decided Aug. 15, 1989.

Michael Barnhart (argued), Barnhart & Mirer, P.C., Detroit, Mich., for plaintiffs-appellees, cross-appellants.

Susan A. Harris (argued), Corrections Div., Lansing, Mich., for defendants-appellants, cross-appellees.

Before MILBURN, Circuit Judge; PECK, Senior Circuit Judge, and ALDRICH, District Judge *.

MILBURN, Circuit Judge.

This is a prisoner civil rights case brought pursuant to 42 U.S.C. § 1983 by Jewish inmates at the State Prison of Southern Michigan ("SPSM"). They challenge a prison policy instituted in 1985 that prohibits them from congregating in weekly Sabbath services and an annual Passover Seder. The defendants-appellants/cross-appellees prison officials appeal from that portion of the district court's decision requiring them to permit an annual Passover Seder. The plaintiffs-appellees/cross-appellants inmates appeal from that portion of the district court's decision rejecting their claim to weekly Sabbath services. For the reasons that follow, we affirm the decision permitting an annual Passover Seder and reverse the denial of the inmates' claim to weekly Sabbath services.

* Honorable Ann Aldrich, United States District Judge for the Northern District of Ohio, sitting by designation.

I.

Harry Whitney and the three other plaintiffs ("inmates") commenced this action on April 14, 1986, by filing a complaint seeking declaratory and injunctive relief from a new prison policy prohibiting them from traveling to the SPSM Central complex for weekly Sabbath services and an annual Passover Seder. The named defendants included Robert Brown, Director of the Michigan Department of Corrections, and Dale Foltz, Warden of the Michigan State Prison ("prison officials"). The inmates claimed the new SPSM policy was unnecessary and overly restrictive and thereby violated their First and Fourteenth Amendment rights. By agreement of the parties, the case was referred to the magistrate, who conducted a two-day hearing on January 12 and 13, 1987.

On October 9, 1987, the magistrate issued findings of fact and conclusions of law and recommended the prisoners be allowed to conduct an annual Passover Seder and Sabbath services every other Saturday. After conducting a brief hearing on February 19, 1988, the district court adopted the magistrate's recommendation allowing annual Passover Seders, but rejected the recommendation permitting biweekly Sabbath services. After the district court denied the prison officials' motion for reconsideration, they filed a timely notice of appeal. The inmates then filed a cross-appeal.

Until the 1970s, the SPSM was operated as a single prison of 4,500 beds. In March 1985, pursuant to a consent order entered in another proceeding, prison officials began to divide the prison into separate, autonomous facilities of various security levels. The SPSM has now been divided into three complexes, with an ultimate goal of having the prison divided into six separate units. It is uncontested that the plan to operate the SPSM as separate units within one wall is in line with current prison management practices and will help the prison reach legitimate goals, including lim-

iting the contact between inmates of various security classifications.

Since 1985, inmate movement between the complexes has been restricted mainly to prisoners undergoing medical or psychiatric treatment in the prison hospital in the North complex, inmate truck drivers and helpers serving the three complexes, and prisoner movement between the complexes to attend prisoner pension fund committee meetings.

The SPSM Central complex is for prisoners assigned to close custody and is the prison's maximum security area. The South complex is for prisoners requiring minimum custody, and the North complex is for medium-custody prisoners. Since 1985, the North complex has been operated as an independent institution with its own warden and staff.

Generally, there are fewer than ten active practitioners of the Jewish faith in the combined inmate population. At the time this action was filed, there were four active practitioners in the Central complex. It is agreed that this case involves the travel of a total of six Jewish inmates from the North and South complexes to the Central complex. It is also agreed that these inmates are sincere in their religious beliefs.

Tenets of the Jewish faith provide that a Sabbath service involves the Torah and a minyan, which is a gathering of no less than ten persons over the age of thirteen of the Jewish faith. Without both a Torah and a minyan, any "service" that would be provided for Jewish believers was characterized below as a "nothing." A Torah is kept in the Central complex, where the prison's Jewish library and chapel are located. The parties agree there is no other location in the prison suitable for housing the chapel, library, and the Torah. The Torah cannot be moved from one complex to another without being searched, an action the faithful consider a desecration. Moreover, moving the Torah would not address the need for gathering ten qualified believers to form a minyan required for a meaningful service.

The Passover Seder is a family celebration of great religious significance to believers in the Jewish faith, in the sense that the concepts of community and family are central to the religion. Seders do not require the presence of a Torah or a minyan. But because the Passover Seder is a celebration of the exodus of the Jewish people out of Egypt, an individual's solo seder, or one conducted with only a very few worshipers, was characterized below as "a very miserable seder."

For approximately forty-five years, from the time the SPSM opened until 1985, Jewish inmates met in the Central complex for weekly congregative Sabbath services. Jewish inmates also met for a congregative Passover Seder. When the prison was divided into three separate complexes in 1985, Jewish inmates were the only inmates permitted to travel between complexes to attend weekly religious services. The Jewish faith, however, is the only religion at the prison that requires a minimum number of inmates to be gathered together before full religious services may be conducted. Sabbath services last for about an hour and fifteen minutes every Saturday, and the magistrate found the Jewish inmates' weekly attendance at these services did not incite anger or jealousy in other inmates.

Movement from the North and South complexes to the Central complex requires walking out of doors, but the inmates remain inside the SPSM walls at all times. Inmates entering from one complex to another are given a pat-down or strip-search. In the year before the new policy became effective, there were no escapes attempted by Jewish inmates, nor were there any reports of attacks on them. In 1983, two inmates going to Sabbath services were found carrying contraband into the Central complex. Prison officials responded by revoking the two inmates' privilege of attending the services.

Warden Foltz testified that the travel of six Jewish inmates to the Central complex for Sabbath services would increase the work on the staff at the gates through which the inmates would pass. He testified that between daily visitors, prisoners traveling to the hospital or other group

meetings in other complexes, and prison staff members traveling from one complex to another, the officers who man the gates must shake down, search, check in and check out hundreds of people a day. In view of the traffic through the gates, Foltz conceded that the addition of six inmates traveling to Sabbath services once a week would have little, if any, impact on the security staff's workload.

Prison officials still allow Rabbi Jeffrey Gale to bring Jewish volunteers to the prison to make up a minyan at Sabbath services in the Central complex. These volunteers must be searched before they enter the complex and are escorted throughout their visit. Over the past two years, Rabbi Gale has brought volunteers into the prison about once a month. But the inmates in the North and Central complexes have not been allowed to attend these services.

One measure of relief the inmates sought in this action was a temporary restraining order to permit a Passover Seder. The plaintiffs were successful in obtaining a TRO which, consistent with prior prison practices, ordered that a seder be allowed in the North complex. The district court later modified its order in response to requests made by the prison officials. The seders conducted pursuant to the TRO have been conducted in the Central complex. In addition, instead of having the inmates and their families prepare traditional foods in the North complex kitchen as in years before, the seders are now catered by a nearby synagogue. Recent seders have been attended by fewer than twenty of the inmates' family members.

In his findings of fact, the magistrate found that many of the prison officials' justifications for the ban on the Jewish inmates' intercomplex travel ultimately arose from problems with overcrowding and understaffing which continued to exist after the ban was in place. The magistrate concluded that the point of "mutual accommodation" in this case would be to require the prison officials to allow the Jewish in-

mates to gather in a Passover Seder and to attend Sabbath services, complete with a minyan and a Torah, on alternate Saturdays.

The district court found the importance of the Passover Seders to the Jewish religion, and the minimum burden they placed on the prison, to compel the acceptance of the magistrate's recommendation that annual Passover Seders be permitted. But it held the ban on travel to Sabbath services was reasonably related to the interest in eliminating mingling between inmates of different security levels, and upheld it.

This appeal presents the question of whether the SPSM policy eliminating the Jewish inmates' intercomplex travel to weekly Sabbath services and annual Passover Seders impermissibly infringes upon the inmates' free exercise of their religion.

## II.

The fact finding in this case was conducted by the magistrate who sat as a master. *See* Fed.R.Civ.P. 53. The magistrate's findings of fact must be accepted unless clearly erroneous. Fed.R.Civ.P. 53(e)(2). The bulk of the facts found by the magistrate were stipulated to in the parties' joint pretrial statement and present little controversy for this court to review.[1]

On the other hand, the magistrate's and district court's conclusions of law are subject to *de novo* review upon appeal. *Loudermill v. Cleveland Bd. of Educ.*, 844 F.2d 304, 308 (6th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 363, 102 L.Ed.2d 353 (1988). Similarly, the findings of ultimate facts based upon the application of legal principles to subsidiary facts is also subject to *de novo* review upon appeal. *Taylor and Gaskin, Inc. v. Chris–Craft Indus.*, 732 F.2d 1273, 1277 (6th Cir.1984).

## A.

"The irreducible core of the first amendment guarantee of the right of free exercise of religious beliefs is the right to prac-

---

**1.** Regarding the findings of the magistrate herein, we do not believe them to be clearly erroneous.

tice privately any religion." *Walker v. Mintzes,* 771 F.2d 920, 930 (6th Cir.1985). Prison inmates do not lose their right to exercise their religion by virtue of incarceration. *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). "However, the circumstances of prison life may require some restriction on prisoners' exercise of their religious beliefs." *Walker,* 771 F.2d at 929.

Our analysis of this case is guided by the Supreme Court decisions in *Turner, supra,* and *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). *See Pollock v. Marshall,* 845 F.2d 656 (6th Cir.) (applying *Turner* analysis to an inmate's free exercise claim), *cert. denied,* — U.S. ——, 109 S.Ct. 239, 102 L.Ed.2d 228 (1988). In *Turner,* inmates challenged Missouri prison regulations which (1) prohibited inmates from corresponding with nonfamily inmates, and (2) permitted inmates to marry only with the permission of the prison superintendent who, by regulation, was to approve only in "compelling" situations, such as the impending birth of an illegitimate child. *Turner,* 107 S.Ct. at 2258. The district court applied a strict scrutiny standard and found both the correspondence and marriage regulations unconstitutional. *Id.* The Supreme Court reversed in part.

The Court construed the case as an opportunity "to formulate a standard of review for prisoners' constitutional claims that is responsive both to the 'policy of judicial restraint regarding prisoner complaints and ... the need to protect constitutional rights.'" *Id.* at 2259 (quoting *Procunier v. Martinez,* 416 U.S. 396, 406, 94 S.Ct. 1800, 1808, 40 L.Ed.2d 224 (1974)). After reviewing several prisoners' rights cases, the Court declared:

> [W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. In our view, such a standard is necessary if "prison administrators ..., and not the courts, [are] to make the difficult judgments concerning institutional operations."

*Turner,* 107 S.Ct. at 2261 (quoting *Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 128, 97 S.Ct. 2532, 2539, 53 L.Ed.2d 629 (1977)).

The Court then set out a four-factor standard to test the validity of a challenged prison regulation. First, courts are to determine if there is a "valid rational connection" between the challenged regulation and the asserted governmental interest. *Turner,* 107 S.Ct. at 2262. Second, are there "alternative means of exercising the right that remain open to ... inmates" if the regulation is upheld? *Id.* Third, will accommodation of the asserted right have an undue impact on guards, other inmates, and prison resources generally? And fourth, is there an alternative to the challenged regulation that fully accommodates the prisoner's rights at *de minimis* costs to valid penological interests? *Id.*

The Court then found the prohibition of correspondence between nonfamily inmates to be a reasonable regulation related to a valid correctional goal. *Id.* at 2264. But the regulation of inmate marriages was deemed to have no reasonable relationship to the asserted penological goal and was struck down as facially invalid. *Id.* at 2267.

The facts of *O'Lone v. Estate of Shabazz,* 107 S.Ct. 2400, bear a slight resemblance to the facts in this case. There, Muslim inmates challenged a prison policy which prevented some of them from attending Jumu'ah, a weekly congregative prayer service commanded by the Koran to be held every Friday after the sun reaches its zenith and before the Asr, or afternoon prayer. *Shabazz,* 107 S.Ct. at 2402. The conflict in the case arose when, as the result of new prison policies, some Muslim inmates assigned to outside work details could not return to the prison in time to attend Jumu'ah. Work details were supervised by a single guard, which meant an entire crew would have to be brought back to the prison to satisfy a single inmate's desire to attend Jumu'ah. Prison officials believed this would disrupt work schedules and increase the security risks near the gate. Muslim inmates alleged the prison policy

unconstitutionally denied them their free exercise rights. *Id.* at 2403.

The Court found a valid, logical connection between the policy of requiring inmates to remain with their work details all day, every day, and the goal of simulating work conditions and responsibilities in society. *Id.* at 2406. The Court then found that while the policy prevented some Muslim prisoners from attending Jumu'ah, they were free to congregate in alternative religious exercises at other times. Muslim inmates could congregate for prayer or discussion at virtually anytime they wanted other than during working hours. Additionally, the state-provided imam had free access to the prison, and the prison provided Muslim inmates with different meals whenever pork was served in the cafeteria. The prison also made special arrangements during the month-long observance of Ramadan, a period of fasting and prayer. During Ramadan, Muslim prisoners were awakened at 4:00 a.m. for an early breakfast and received a late dinner. *Id.*

The Court also found that accommodating the inmates' desire to return for Jumu'ah on Friday afternoons would have had an undue impact on other inmates, prison personnel, and the allocation of prison resources generally. *Id.* The Court concluded prison officials had no ready alternative to the challenged policy and, after weighing all *Turner* factors, upheld it. *Id.* at 2407.

## B.

The prison officials here appeal that part of the district court's decision allowing annual congregative Passover Seders. The prison officials argue that the policy banning Passover Seders meets all four *Turner* factors and should be upheld. Additionally, they assert that this case cannot be distinguished from *O'Lone.* We find these arguments to be unpersuasive.

First, this case may easily and significantly be distinguished from *O'Lone.* That case involved a number of Muslim inmates who, essentially, sought to be released from outside work details every Friday. That is a far cry from this case, which involves six inmates who want to gather at a Passover Seder for a few hours once a year. Moreover, the Supreme Court noted in *O'Lone* that the prison made special accommodations for the Muslim inmates at "holiday" times in their religion. For example, during the month-long period of Ramadan, the inmates were awakened with a special breakfast at a special time and later fed a special dinner at a special time. In this case, Passover is an especially critical and very special time in the Jewish religion, one for which the prison officials wish to make absolutely no accommodation.

Turning to the four-factor analysis of *Turner,* we have no doubt that the goal of minimizing mingling between inmates of different security levels is sound prison management. But this is only one of several considerations we must review before deciding on the validity of the challenged policy.

Despite the prison officials' vigorous claims to the contrary, the challenged policy forecloses the only means by which the Jewish inmates may exercise their asserted right to mark Passover. As the magistrate and district court noted, the whole point of a Passover Seder is a joint celebration. The prison officials assert that because no minimum number of believers is required to conduct a seder, even prisoners in solitary confinement may hold one. Yet as the testimony indicated, such seders are more a marking of the misery in Jewish history than a celebration of the promise of the Exodus.

Interestingly, the prison officials argue that the inmates may gather for smaller seders within their separate complexes, which may be attended by family members from outside the prison. Yet the prison officials use the family members as a reason to ban the joint Passover Seder. They argue that the additional monitoring and security necessarily involved whenever people from outside the prison attend the social gatherings within are a drain on the prison and prison resources. So under the "alternatives" *Turner* factor, the prison officials welcome the family members into each complex of the prison for smaller sed-

ers. Yet under the "impact" factor, they find the same family members to be a troublesome burden and reason to ban the one large Passover Seder.

The prison officials also assert that the Passover Seders incite jealousy and anger in other inmates. As a finding of fact, the magistrate found this is not the case. Rather, he found that "[t]he impact of allowing a continuance of Jewish religious service is minimal in terms of preception [sic] of favoritism by other prisoners." J.A. 75.

As noted above, the Jewish inmates have greatly modified their Passover Seder to meet the prison officials' requests. The site has been moved to the Central complex, and the food is now catered so that the prison staff need not make any accommodations. Moreover, as the parties agreed in their joint pretrial statement, there have been no security problems with any visitors to the Passover Seders.

Perhaps the greatest weakness in the prison officials' arguments is their misunderstanding of *Turner* and *O'Lone* as holding that federal courts will uphold prison policies which can somehow be supported with a flurry of disconnected and self-conflicting points. They seem to read *Turner* and *O'Lone* as saying that anything prison officials can justify is valid because they have somehow justified it. In an argument typical of their conclusory approach to the problem, the prison officials maintain that the Passover Seders should be banned because "[a]ny time the normal routine of an institution is altered, the good order and security of that facility are potentially compromised." Prison officials' Brief at p. 8. The fact remains, however, that prison officials do not set constitutional standards by fiat.

The officials also overlook the religious significance of a Passover Seder. As found by the magistrate, it marks the exodus of the Jewish people from Egypt. It is a most sacred time for believers in the Jewish faith, both for historic reasons and for its celebration of family and community, which are central to the faith. As Rabbi Gale testified, seders held by individuals

are technically possible but effectively "miserable." The district court found the Passover Seders, as modified to meet the prison officials' requests, fully accommodate the inmates' rights at a *de minimis* cost to the prison officials' valid penological interests and should be permitted. We agree.

### C.

The inmates appeal that portion of the district court's decision upholding the ban on intercomplex travel for Sabbath services. They argue that, under proper application of *Turner* and *O'Lone*, the ban is an exaggerated response to speculative security concerns. They argue that the elimination of their weekly Sabbath services after forty-five years is not reasonably related to legitimate penological interests. We agree.

The inmates first argue that their intercomplex travel poses few, if any, problems for prison officials. The parties agree the travel in question involves six inmates out of a total population of more than 4,500 prisoners. Their travel occurs on Saturdays, traditionally a busy day for prison visitors and a time when prison security is heightened. The Sabbath services themselves last about an hour and fifteen minutes. The Jewish inmates used to travel from the North complex to the Central complex for Sabbath services by passing through a gate between the walls of these complexes and then going on, unescorted, to the chapel. Prison officials assert this made the Jewish inmates vulnerable to attack by other prisoners. But the inmates assert, and the magistrate found, there was no evidence to support the claim that Jewish inmates who attend Sabbath services are any more vulnerable to attack than other inmates.

Similarly, the inmates assert the prison officials' concerns for the potential for escape and the smuggling of contraband are unfounded. The parties agree that there were no attempted escapes during the year before intercomplex travel was prohibited. Indeed, the magistrate found:

A review of the record establishes, however, that the two prisoners involved in

the smuggling incidents were dealt with individually and their privileges to attend religious service [sic] was canceled. Defendants have failed to show that other incidents involving misbehavior and escape attempts by Jewish prisoners are unique with Jewish prisoners, or related to movement to and from or attendance at a Sabbath service.

J.A. 77.

In response to questions posed by the court during the magistrate's hearing, Warden Foltz was asked if searching the six Jewish inmates once a week in relation to their travel to Sabbath services posed a security problem. He responded, "[o]ther than the time it takes for the staff to do the search, that would be the only one. You know, the time it takes to search, and then they come back out of the institution, it's a strip search." J.A. 137. Later, when Foltz was asked about traffic at the main gate through which the six inmates would pass, he responded:

A: Because there is an awful lot of flow. There's an awful lot of people that go through the gates at Jackson Prison. I mean, it isn't just six. It's a shift with 97 officers—roughly 97 three times a day that go through it, plus all the other flows that are going in and out. Just staff alone that are shook down, detailed in, detailed out, fingers—back of hands marked. And all the visits for about 3,000 inmates go through those same gates.

Q [BY THE COURT]: But what not is included in that awful lot of traffic is six Jewish people going to a weekly service?

A: Yes.

Q [BY DEFENSE COUNSEL BARN-HART]: Given all the traffic that is going through there anyways, does six more make much difference?

A: No.

J.A. 138.

The inmates also argue that their travel to and from Sabbath services is easily distinguished from that travel requested by the Muslim prisoners in *O'Lone.* There, the prisoners sought to have their respective work details interrupted every Friday, which would have, among other things, created severe security problems at the prison gate as guards returned with their work details to drop off perhaps only one or two Muslim prisoners. Here, the inmates' travel would be on Saturdays, not in avoidance of any work details, and on a day when the prison is otherwise busy with intercomplex travel such that, as Warden Foltz testified, the six inmates would pose no real additional security problem.

The inmates acknowledge that plans to divide the SPSM into separate facilities one day, apparently now five or six years down the road, might raise other questions concerning inmates' intercomplex travel. But they argue that speculation over possible security problems in the next decade should not block them from intercomplex travel now, especially in light of the existing traffic within the SPSM. Indeed, the magistrate found:

[T]here is currently a steady stream of traffic between the complexes involving mandatory meetings of the Inmate Benefit Fund committee, inmate truck drivers and helpers serving the various complexes, and out-patient travel to and from the prison hospital which is located in the north complex.

\* \* \* \* \* \*

Again, the wisdom of ... the future plans for the Jackson facility are not challenged; however, the matters involved and issues raised in this litigation are to be resolved based upon conditions as they now exist, and not as conditions may exist sometime in the future. Future plans, inherently including a degree of speculation, should not be used as grounds to forfeit present constitutional rights. In this sense, this matter is be [sic] distinguished from *O'Lone v. Estate of Shabazz, supra,* where the court dealt with programs that were actually in place.

J.A. 78–79.

Additionally, the inmates point out that Warden Foltz testified that prison security can accommodate travel to and from the hospital, and the housing of inmates from various security levels within the hospital,

because the hospital is a maximum security facility. Similarly, the Jewish chapel is in the Central complex, which is the most secure area in the SPSM. The inmates argue convincingly that if current inter-complex travel by inmates of various security levels to a high security hospital does not threaten security interests and is tolerated by prison officials contemplating the eventual breakup of the SPSM into separate units, then a policy prohibiting the intercomplex travel of a few Jewish inmates to weekly Sabbath services in a maximum security complex is inconsistent and irrational.

Perhaps the most glaring inconsistency in the prison officials' arguments, one which undermines their entire case, involves Jewish volunteers from Ann Arbor, Michigan. Prison officials concede the need for a minyan, a quorum of ten Jewish adults, to conduct Sabbath services, and they acknowledge that the prohibition of intercomplex travel prevents the Jewish inmates from assembling a minyan. But they argue that prisoners in the Central complex can assemble a minyan because Rabbi Gale is permitted to bring volunteers from the Jewish community and surrounding areas into the prison for Sabbath services. There appears to be no limit on how often the Rabbi may bring his volunteers or how many he may bring. The Rabbi testified he usually brings volunteers to the Central complex on the average of once a month.

We find it remarkable that, while prison officials prohibit intercomplex travel by six Jewish inmates based upon security concerns, they simultaneously welcome the Rabbi and his volunteers into the maximum security cell block for Sabbath services. If prison officials are concerned about Jewish inmates' vulnerability to attack, surely the volunteers are equally vulnerable. If inmates traveling from one complex to another raise the possibility of smuggling contraband, surely volunteers entering the prison from outside pose an equal danger. Prison officials argue that the intercomplex travel of the inmates causes many security headaches at complex gates, the need for escorts, and the need for constant monitor-

ing. Yet volunteers pass through the same gates, on the same days, and surely require the same, if not more, in terms of escorts, monitoring, and protection. We find it difficult to give much weight to complaints of the strain the Jewish inmates' travel to Sabbath services allegedly places on the security staff when prison officials simultaneously tout the admission of community volunteers into the maximum-security complex as religious relief available to some inmates.

We fail to see how any of the security interests raised to justify the challenged ban suddenly became threatened in 1985, after forty-five years of weekly inmate travel to Sabbath services. Similarly, we cannot ignore the inconsistencies regarding the allowed intercomplex travel, and the admission of community volunteers into the Central complex for weekly Sabbath services. In sum, we agree with the inmates that the challenged ban on their travel to Sabbath services fails to satisfy the first *Turner* consideration requiring that a regulation have a logical connection to the legitimate governmental interest invoked to justify it.

The inmates argue that because the policy fails at the first *Turner* prong, it necessarily fails to pass constitutional muster. But *Turner* presents a court with guidelines to be weighed in the evaluation of a regulation. Therefore, we continue with our analysis, unconvinced that a challenged regulation must be rejected merely because it falters at one consideration.

*Turner* next directs our attention to possible alternative means the inmates might have of exercising their asserted rights if the SPSM policy is upheld. Predictably, the inmates argue they have no alternatives to weekly Sabbath services. Without a minyan and a Torah, the Jewish inmates are left with a religious service that Rabbi Gale described as a "nothing." The Rabbi also explained that a central part of the Jewish faith is group religious study, which is impossible where there is no group. This led the magistrate to conclude:

The ban on movement by Jewish prisoners between complexes to attend a Sabbath service involving the Torah and the required Minyan, effectively prevents prisoners of the Jewish faith from having meaningful religious services.

J.A. 74.

The inmates contrast their situation with that of the Muslim inmates in *O'Lone*. There, some of the inmates were prevented from attending weekly Friday afternoon prayer meetings. But the Supreme Court noted that the Muslim prisoners were "not deprived of all forms of religious exercise, but instead [could] freely observe a number of their religious obligations" despite the contested policy. *O'Lone*, 107 S.Ct. at 2406. The prisoners' right to congregate for prayer or discussion was "virtually unlimited except during working hours." *Id.* In sharp contrast, without weekly Sabbath services, the Jewish inmates at SPSM are left with "nothing."

Turning to the third *Turner* consideration of "impact," the inmates assert their intercomplex travel to Sabbath services imposes minimal burdens on prison staff and resources, and does not provoke jealousy or anger in other inmates. As noted above, the magistrate found other inmates were neither jealous nor angered if the six Jewish inmates spent part of their Saturdays in religious services. This is in sharp contrast to *O'Lone*, where the Muslim prisoners were effectively seeking to avoid work detail one day a week, which could have placed an immense burden on the prison staff and most likely provoked much jealousy among the prison inmate population.

Moreover, as Warden Foltz testified, the addition of six inmates traveling to the Central complex on Saturdays would make virtually no difference in the prison staff's workload. Assistant Warden Frank Elo testified that the intercomplex inmate travel required the construction of a "paper trail," as prison security staff had to keep track of all inmates at all times. In light of Warden Foltz's testimony, however, and the magistrate's findings with regard to internal prison pedestrian traffic, it appears unlikely that the addition of six inmates to the busy Saturday schedule would be significant. Moreover, given that the prison welcomes the Saturday visits of Rabbi Gale's volunteers, despite the necessary construction of a paper trail and the need to provide escorts and security officers for the visitors, we view with extreme skepticism the argument that the intercomplex travel of six inmates imposes an undue burden on prison resources and staff.

The prison officials argue they have no "obvious, easy alternatives" to their policy. *Turner*, 107 S.Ct. at 2262. This absence of ready alternatives, they argue, "is evidence of the reasonableness of [the] prison regulation." *Id.* The inmates counter that the method by which they formerly traveled to Sabbath services fully accommodated their religious rights at *de minimis* costs to the prison's interests. They again point to inmate travel to and from the maximum security hospital as evidence of the minimal burden their travel to Sabbath services places upon prison security and resources. They also argue there are even less burdensome paths of travel the prison could allow them to take to the Central complex.

The presence or lack of alternatives to the challenged policy that accommodate the prisoners' rights at *de minimis* costs to valid penological interests is but one of the four considerations *Turner* sets out for this court to review. The inmates present a very persuasive argument that their prior travel practices fully accommodated their rights at *de minimis* costs to the prison's penological interests. But even if the inmates' arguments are disregarded here, the prison officials' showing on this one factor does not outweigh the inmates' arguments on all of the others.

The prison officials have identified several concerns which they assert justify the prohibition of the six Jewish inmates' intercomplex travel to Sabbath services. Based upon the above *Turner* analysis, we believe the challenged prohibition is not reasonably related to these interests. Indeed, it is difficult to see how the asserted security interests are implicated by the intercomplex travel, especially in light of the forty-five year history of the Sabbath services in

the prison and the prison officials' welcoming of community volunteers into the Central complex. Nor on this record is it clear or even established how the prison's plans to reorganize in the future require that the six Jewish inmates give up their Sabbath services now. We find the prohibition of intercomplex travel of the six Jewish inmates to be an exaggerated response to speculative security objectives, and, therefore, it is invalid.

### III.

For the foregoing reasons, that portion of the district court's judgment permitting annual Passover Seders at the SPSM is AFFIRMED. But that portion of the district court's judgment rejecting the inmates' claim to intercomplex travel to weekly Sabbath services is REVERSED, and this case is REMANDED with instructions to the district court to enter a judgment permitting the intercomplex travel of Jewish inmates at SPSM to weekly Sabbath services in the Central complex.