Lorraine BILLS, Plaintiff–Appellant,

v.

Sgt. Dennis W. ASELTINE, Officer Brian P. Denoyer, Officer Rick Davis, Officer Jeffrey K. Ewald, Officer Debra Gawron, Officer Medbury, and Chief Larry Owen, Defendants–Appellees.

No. 92–2556.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 12, 1994.

Decided April 26, 1995.

Robert J. Dinges (briefed), Robert J. Dinges & Associates, Frank X. Fortescue (argued), Detroit, MI, for Lorraine I. Bills.

Dennis J. Clark (argued and briefed), Plunkett & Cooney, Detroit, MI, Thomas P. Vincent, Plunkett & Cooney, Lansing, MI, for Dennis W. Aseltine, Sgt.

Thomas P. Vincent, Plunkett & Cooney, Lansing, MI, for Brian P. Denoyer, Jeffrey K. Ewald, Rick Davis, Larry Owen, Debra Gawron, Officer Medbury.

Before: MILBURN, BOGGS, and NORRIS, Circuit Judges.

BOGGS, Circuit Judge.

Plaintiff Lorraine Bills appeals from the district court's grant of summary judgment for the defendants. The case had previously been dismissed by the district court after a finding of qualified immunity, but this court reversed in part, in *Bills v. Aseltine*, 958 F.2d 697 (6th Cir.1992) ("*Bills I*"). We remanded the case to resolve issues of material fact concerning whether Sgt. Dennis Aseltine, who led the search, had been "objectively unreasonable" in inviting a private security officer to accompany him in executing a search warrant, as well as to decide questions of state constitutional law. A jury concluded that the officer had not acted unreasonably, and the district court dismissed Bills's state constitutional claims as a matter of law. Because we determine that there was no legal or trial error and hold that the jury's finding as to Sgt. Aseltine precludes liability for the other defendants, we affirm the judgment of the district court.

**I**

In the summer of 1987, Sergeant Dennis Aseltine of the Pinckney, Michigan, Police Department obtained information that plaintiff's son, Charles Sutton, was stealing radar detectors and that his mother and stepfather, Dennis Bills, were selling them in the parking lot of the General Motors ("GM") Proving Grounds. Aseltine passed this information on to William Meisling, a security officer at GM, who informed Aseltine that GM was already investigating Mr. Bills concerning the theft of GM property. Aseltine had also

heard "on the street" in the Pinckney area that Mr. Bills was in possession of stolen GM property.

On August 20, 1987, Chief Larry Owen of the Unidella Township Police called and told Aseltine that he had been notified that a stolen Kubota-brand generator was at the Billses' house. Aseltine met with Owen and his informant, who told Aseltine that he had also seen a large quantity of GM property on the premises. Aseltine was confident of the informant's reliability, so he proceeded to obtain a search warrant for the Kubota generator; he did not seek a search warrant for GM property because he felt he lacked sufficient probable cause. The warrant authorized a search of the Billses' home, garage, and adjoining shed, and also authorized the seizure of the Kubota generator.

Remembering that GM was also investigating the Billses, Aseltine called and invited Meisling to accompany the police in executing the search warrant. Aseltine also obtained the assistance of Chief Owen and officers from the Unidella Township, Hamburg Township, Livingston County and Pinckney police forces.[1]

Charles Sutton answered the door (plaintiff and her husband were not at home) and was served the warrant. Sutton immediately led Aseltine to the Kubota generator in the shed, while the other officers executed a protective sweep to secure the house. Police spotted a Yamaha-brand generator near the Kubota model, and a check of police records revealed that it was stolen. Officer Gawron of Hamburg Township was dispatched to procure a warrant for its seizure.

Meisling arrived shortly after the Kubota generator was found and seized. He accompanied the officers as they conducted a "plain view" survey of the house while they waited for Gawron to return with the search warrant. They discovered large quantities of GM parts and equipment,[2] and Meisling took 231 photographs of these items without physically disturbing any of them.

The next morning, Meisling contacted the Michigan State Police about recovering from the Billses' home what he suspected was stolen GM property. Meisling and State Trooper Darnell Seering, a friend of Meisling, met with a Livingston County prosecutor to prepare an affidavit to support a search warrant. Meisling related how Aseltine had invited him to go along on the earlier search and that he had observed and photographed GM property in the Billses' home.

A second search warrant was issued on the sole basis of Meisling's affidavit, and on August 21, Seering, Meisling, two local police officers, and two GM employees went to the Billses' residence. They seized a variety of auto parts and equipment. Mr. Bills was charged with receiving and concealing stolen property, but a state court suppressed all of the evidence seized on August 21 as being tainted by the overly broad search the day before.

Lorraine Bills sued all the police officers involved in the searches, their respective municipalities, and the state of Michigan, under 42 U.S.C. §§ 1983, 1985, and 1988, alleging infringement of her rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. She also claimed violations of the Michigan Constitution and state law causes of action for trespass and negligent or intentional infliction of emotional distress. The district court granted summary judgment for the defendants on all of Bills's claims. On appeal, the Sixth Circuit reversed the district court's finding of qualified immunity because "genuine issues of material fact exist concerning the reasonableness of the conduct of the police in inviting a private citizen into the dwelling of another for purposes unrelated to the execution of the search warrant." *Bills I*, 958 F.2d at 709. The court also remanded the pendent state constitutional claims because

---

1. The police justified the large numbers of personnel based on talk in the community of automatic-weapons fire around the Billses' home, the house's location on five acres of land in the country, and the Billses' ownership of pit bulls and Doberman pinschers.

2. A sampling: nine fire extinguishers, seventy-six sets of shock absorbers, sixteen cans of glass cleaner, an antenna for an electric vehicle, several alternators and starters, an impact wrench, and six fuel injectors.

they had been dismissed based on the absence of an underlying federal constitutional violation. *Ibid.*

Upon remand, in an order dated September 29, 1992, the district court dismissed Bills's claims against all of the defendants except Aseltine because the court found that all of those defendants were protected by qualified immunity. The court noted that government officials are entitled to qualified immunity while performing discretionary functions so long as their actions do not violate clearly established rights of which any reasonable official would have known. *See Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Finding no evidence that any of the other police officers knew Meisling was present for private purposes, the court concluded that a reasonable officer would not have questioned Meisling's presence because he had been invited by and stayed close to Aseltine. However, the court could not decide as a matter of law whether Aseltine's conduct had violated clearly established law or whether he should have known he was exceeding the scope of the search warrant by inviting Meisling. Therefore, a jury trial was required to determine whether his conduct was reasonable. The court dismissed the remaining claims in a later order because the state of Michigan was immune to a § 1983 suit based on the actions of an individual who violated state constitutional guarantees.

The district court sent the case to a jury on the issue of whether Aseltine had "unreasonably exceeded the scope of the warrant" by procuring "a private person to tour plaintiff's home with a camera for purposes utterly unconnected with the search warrant they had already executed." The jury returned a verdict for the defendant.

## II

Bills raises a variety of issues on appeal. She first contends that the district court erred in granting summary judgment to defendants on her claims arising under the state constitution. She claims that the district court erred in granting qualified immunity to all the officers except Aseltine. Bills argues that the district court abused its discretion in its use of special interrogatories, by instructing the jury on the Fourth Amendment and failing to give two of plaintiff's proposed instructions, and in allowing the defendants' witnesses to refer to property observed during the search as "stolen" or "GM property." Last, she asserts that the district court erred in denying her motion for a directed verdict. We shall deal with each contention in turn.

### A. Michigan law governing infringement of state constitutional rights.

The district court dismissed Bills's state law claims because it found that Michigan law does not recognize a cause of action against individuals for violations of the state constitution. A district court's conclusions of law are subject to *de novo* review on appeal. *United States v. Braggs,* 23 F.3d 1047, 1049 (6th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 274, 130 L.Ed.2d 191 (1994); *Whitney v. Brown,* 882 F.2d 1068, 1071 (6th Cir.1989). An appellate court must review the evidence "in the light most likely to support the district court's decision." *Braggs,* 23 F.3d at 1049 (citing *United States v. Gomez,* 846 F.2d 557, 560 (9th Cir.1988)).

The parties agree that the question of whether a cause of action exists for a violation of the state constitution is controlled by the Michigan Supreme Court's decision in *Smith v. Dep't of Public Health,* 428 Mich. 540, 410 N.W.2d 749 (1987). The general rule is that "there is no implicit right to sue the state for damages on the basis of violations of ... the Michigan constitution," although liability will be found in appropriate cases. *Id.* 410 N.W.2d at 792. A close reading reveals that *Smith* allowed suits only where "the state's liability would, but for the Eleventh Amendment, render it liable under the 42 USC 1983[sic] standard for local governments articulated in *Monell v. New York City Dep't of Social Services* [436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ]." *Smith,* 410 N.W.2d at 794 (Boyle, J., concurring).

The United States Supreme Court in *Monell* permitted liability only where the unconstitutional action "implements or executes a

policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." 436 U.S. at 690, 98 S.Ct. at 2035–36. Hence *Smith* allows Bills a cause of action only if she "alleges that defendant has violated the state constitution by virtue of custom or policy." *Marlin v. City of Detroit,* 177 Mich.App. 108, 441 N.W.2d 45, 48 (1989). The Sixth Circuit has similarly interpreted *Smith* as authorizing a cause of action only where the constitutional violation was pursuant to a municipality's "policy or custom." *Pleasant v. Zamieski,* 895 F.2d 272, 278 (6th Cir.), *cert. denied,* 498 U.S. 851, 111 S.Ct. 144, 112 L.Ed.2d 110 (1990).

However, this court has already ruled that Bills has no cause of action because she has failed to satisfy the *Monell* standard for municipal liability:

> *Neither is there any proof in the record concerning the existence of municipal policies or customs that might have resulted in the alleged unconstitutional conduct in this case.* Instead, plaintiff merely argues that, because [Aseltine and Owen] were officers of some seniority within their police departments, they must be responsible for policy.... This is mere argument, not evidence.... Plaintiff offers nothing more than the inference she draws from a single, allegedly unconstitutional action. *This is not sufficient to fix liability on the municipal defendants.*

*Bills I,* 958 F.2d at 708 (emphasis added). Accordingly, we affirmed the district court's dismissal of the claims against the municipalities. *Id.* at 709 (holding that there was no evidence that the officers were following a municipal custom or policy or that they were untrained or that the municipalities were deliberately indifferent to the constitutional rights of their citizens). Thus, the district court properly concluded that Bills did not have a claim under the Michigan Constitution against the state and that *Smith* did not create a cause of action against individual officers.

**B. Qualified immunity of the police officers other than Aseltine.**

■ Bills objects to the district court's granting of summary judgment to the other

police officers on the basis of qualified immunity. "Resolution of qualified immunity is purely a question of law," *Poe v. Haydon,* 853 F.2d 418, 424 (6th Cir.1988), *cert. denied,* 488 U.S. 1007, 109 S.Ct. 788, 102 L.Ed.2d 780 (1989), and this court reviews the district court's legal determinations *de novo. Braggs,* 23 F.3d at 1049; *Whitney,* 882 F.2d at 1071.

■ The trial court is ultimately responsible for resolving the issues raised by such a defense, and the case should go to trial only if there is a genuine issue of material fact upon which the qualified immunity turns. *Heflin v. Stewart County,* 958 F.2d 709, 717 (6th Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 598, 121 L.Ed.2d 535 (1992). The court in *Bills I* decided that such a factual question existed when it reversed the district court's dismissal because "genuine issues of material fact exist concerning the reasonableness of the conduct of the police in inviting a private citizen into the dwelling of another for purposes unrelated to the execution of the search warrant." *Bills I,* 958 F.2d at 709. However, since only Aseltine has been accused of inviting Meisling into the Billses' home for the search, *Bills I* did *not* resolve whether the other police officers are entitled to qualified immunity. Therefore, whether the other police officers who accompanied Aseltine are entitled to qualified immunity remains a question of law, warranting *de novo* scrutiny.

### 1

■ Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). The test for whether an official is entitled to qualified immunity is one of "objective reasonableness," which requires "a reasonably competent public official [to] know the law governing his conduct." *Harlow v. Fitzgerald,* 457 U.S. 800, 818–19, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

The constitutional or statutory right alleged to have been violated must have been "clearly established" in a particularized sense:

The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) (citations omitted).

Additionally, "the district court must decide the purely legal question of whether the law at the time of the alleged action was clearly established in favor of the plaintiff." *Dominque v. Telb,* 831 F.2d 673, 676 (6th Cir.1987). The Supreme Court has stressed that a court must carefully define the rule that is at issue:

The operation of this standard, however, depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow.* Plaintiffs would be able to convert the rule of qualified immunity ... into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.

*Anderson,* 483 U.S. at 639, 107 S.Ct. at 3039.

The Second Circuit dealt with a case similar to this one in *Ayeni v. Mottola,* 35 F.3d 680 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1689, 131 L.Ed.2d 554 (1995), but reached a contrary result. In *Ayeni,* Secret Service agents allowed a camera crew from CBS Television's "Street Stories" to accompany them while executing a search warrant. *Ayeni* may be distinguished by the court's failure to define narrowly the right allegedly violated, instead describing the violation in abstract and general terms as a Fourth Amendment right to privacy:

Agent Mottola correctly asserts that there is no reported decision that expressly forbids searching agents from bringing members of the press in to a home to observe and report on their activities. He therefore argues that there is no clearly established rule prohibiting such an act. The argument lacks merit. It has long been established that the objectives of the Fourth Amendment are to preserve the right of privacy to the maximum extent consistent with reasonable exercise of law enforcement duties.... Mottola exceeded well-established principles when he brought into the Ayeni home persons who were neither authorized by the warrant ... nor serving any legitimate law enforcement purpose by being there. A private home is not a soundstage for law enforcement theatricals.

35 F.3d at 686. It is hard to imagine any contested search that could not be portrayed as an invasion of privacy, and even more difficult to see how a police officer could tailor his conduct under such a vague standard. As with the example of the Due Process Clause cited in *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039, the fact that the Fourth Amendment embodies "well-established" principles will not defeat a claim of qualified immunity. Otherwise, the doctrine is rendered a mere rule of pleading.

▮ The Second Circuit cited *Bills I* for the proposition "that permitting the presence of a third party not assisting in a search *may* violate the Fourth Amendment." *Ayeni,* 35 F.3d at 686 n. 8 (emphasis added). The word "may" is of great significance; the Sixth Circuit has determined that the presence of a private citizen at the execution of a search warrant is not *per se* a constitutional violation. The court in *Bills I* discussed *United States v. Clouston,* 623 F.2d 485 (6th Cir. 1980), which held that the attendance of telephone company employees at a search was not unconstitutional. In *Clouston,* the employees were asked by the police to be there to help them identify company equipment.

623 F.2d at 486. Thus, under certain circumstances, the presence of private citizens at a search will not be a constitutional violation, particularly when they are assisting the police. *See* 18 U.S.C. § 3105 (1985) (authorizing persons "in aid of the officer" to accompany law enforcement officers in enforcing federal search warrants); *Huggins v. Oklahoma*, 861 P.2d 1007, 1009 (Okla.App.1993) (joining "other forums" and citing *Clouston* in allowing "the use of private persons to help law enforcement officials in the execution of a search"); *People v. Boyd*, 123 Misc.2d 634, 474 N.Y.S.2d 661, 666 (Sup.Ct. 1984) ("[T]he five sister states that have had occasion to consider the issue of civilian assistance in search warrant situations have all ruled that police need not forego [that] type of aid....").

The full parameters of the role of private citizens in executing search warrants has not been completely, or clearly, defined. *Clouston* says they may assist, *Ayeni*[3] says they may not exploit their role for commercial gain, and *Bills I* says that the reasonableness of the officer's invitation in this particular case must go to a jury, as it did.

The issue with respect to the other officers is easier to resolve than for Aseltine because they did not affirmatively act to invite Meisling; their violation, if any, is that they failed to detect and prevent Meisling's misconduct. The court in *Bills I*, like the Second Circuit in *Ayeni*, concluded that Meisling was not in the Billses' home to aid in the search. Aseltine admits as much, as the search warrant was only for the Kubota generator. However, it is unclear whether the attending officers knew or should have known that Meisling was not serving a *Clouston*-like function. This is the crucial question for purposes of their right to qualified immunity.

■ The qualified immunity standard in the context of the execution of a search warrant requires determination of whether a "reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization." *Bills I*, 958 F.2d at 705, (quoting *United States v. Leon*, 468 U.S. 897, 922 n. 23, 104 S.Ct. 3405, 3420 n. 23, 82 L.Ed.2d 677 (1984)). Since the policemen accompanying Officer Aseltine had no role in procuring the warrant, the test can be recast as "based on all of the circumstances, whether a reasonably well-trained officer would know that Meisling's presence violated Bills's constitutional rights despite Aseltine's having apparently authorized it."

The standard of objective reasonableness requires us to ask whether every "officer in the *defendant's* position, measured objectively, would have clearly understood that he was under an affirmative duty to have refrained from such conduct." *Brandenburg v. Cureton*, 882 F.2d 211, 215 (6th Cir.1989), *quoting Dominque*, 831 F.2d at 676; *see Wolfel v. Morris*, 972 F.2d 712, 719 (6th Cir.1992). A court should be wary of simply substituting its view in hindsight for the police officers' opinion. Assuming that it was clearly established that the presence of a private citizen who is not assisting the police is a constitutional violation, it is still not apparent that any officer other than Aseltine knew of Meisling's true role.

Bills makes several points in arguing that the attending officers should have known that Meisling was there illegally and not merely to assist the police.[4] The district court did not seem to consider these factors. First, Meisling did nothing to aid the police on the scene. Instead, he walked around with Aseltine, taking photographs. Second, Meisling did not arrive until after the Kubota generator was found, so there was nothing for him to assist with. Finally, there were no affidavits from the officers stating a lack of knowledge.

---

**3.** Obviously, the specific rule in *Ayeni* was not clearly established at the time of the search of Bills's home.

**4.** Plaintiff states that Officer Gawron actually drove Meisling to the Billses' home, thinking that he was present to look for "fuzzbusters." *Pet. Brief* at 14. Consequently, she "knew she was procuring the presence of Meisling for purposes solely unrelated to the objects of the search warrant for the generator." *Ibid.* However, the testimony of Meisling and Gawron suggests that Gawron merely led Meisling to the Billses' home, after Aseltine, the other officers, and Meisling met at the police station before the search.

The district court should also have considered various facts that suggest that the officers would not realize Meisling's presence was illegal. Meisling stayed with Aseltine. When he was in the Billses' home, Aseltine was the officer in charge of the search and the other officers were otherwise occupied in securing the premises, obtaining a warrant for the Yamaha generator, seizing a marijuana plant in plain view, and arresting Charles Sutton.

The district court did not properly view the evidence to the benefit of the nonmoving party. Taking the inferences from these facts in the light most favorable to Bills, a reasonable well-trained officer might have been aware that Meisling was not assisting the police, but instead conducting an illegal search.

### 2

■ Defendants argue that the question of whether the other police officers were liable for violating Bills's constitutional rights was nonetheless mooted when the jury found that Aseltine had not been unreasonable in inviting Meisling to enter the Billses' residence. They contend that their liability can only be derivative from Aseltine's. Resolution of the issue of mootness, however, depends upon whether the reasonableness of the accompanying officers' conduct has already been resolved and thus constitutes collateral estoppel. "The availability of collateral estoppel is a mixed question of law and fact which we review *de novo*." *United States v. Sandoz Pharmaceuticals Corp.*, 894 F.2d 825, 826 (6th Cir.), *cert. denied*, 498 U.S. 810, 111 S.Ct. 45, 112 L.Ed.2d 21 (1990).

■ Collateral estoppel may be used defensively "to prevent a plaintiff from asserting a claim that the plaintiff has previously litigated and lost against another defendant." *Patrick v. South Central Bell Tel. Co.*, 641 F.2d 1192, 1199 n. 3 (6th Cir.1980). Four criteria must be met to preclude further litigation under the doctrine of collateral estoppel (or "issue preclusion"):

(1) the precise issue raised in the present case must have been raised and actually litigated in the prior proceeding; (2) determination of the issue must have been nec-essary to the outcome of the prior proceeding; (3) the prior proceeding must have resulted in a final judgment on the merits; (4) the party against whom [collateral] estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding.

*Detroit Police Officers Ass'n v. Young*, 824 F.2d 512, 515 (6th Cir.1987).

In this case, the trial below provided a final judgment on the merits and a full and fair opportunity to litigate the issue of Aseltine's liability, thus satisfying the third and fourth parts. The second element of the test is also easily met—the jury's determination of the reasonableness of Aseltine's conduct was crucial to the outcome of the case, and it was the precise issue we remanded to the trial court to resolve. The critical issue is the first element: whether the jury's conclusion that Aseltine's invitation to Meisling was not unreasonable is determinative of the question of whether the other police officers' failure to prevent Meisling's actions was unreasonable.

We hold that Aseltine's culpability is necessary to any liability of the other officers. Aseltine actively *performed* (invited Meisling to the search) what they merely failed to prevent, and he actually *knew* what they might only suspect. The officers' alleged violations were, in essence, "lesser included offenses" of Aseltine's, so that the jury's finding that Aseltine acted reasonably must mean that there can be no liability for failing to prevent "reasonable" actions. Thus, we find that Bills is collaterally estopped from going to a jury on the reasonableness of the attending officers' conduct. Since the officers did not act unreasonably, they are entitled to qualified immunity.

### C. Propriety of the special interrogatories.

■ Bills argues that a special interrogatory on the verdict form did not state all the issues, was inaccurate, and consequently misled the jury. The verdict form provided to the jury stated: "Was it unreasonable under the circumstances for the defendant to invite William Meisling to enter plaintiff's home on

August 20, 1987?" The court submitted questions asking if Aseltine had a "reasonable and good faith belief" that he was not violating Bills's rights, and if his conduct proximately caused injury to Bills. The court also asked the jury to assess damages if appropriate. Bills contends that the court should have submitted her proposed special interrogatory: "Did Sgt. Aseltine unreasonably exceed the scope of the search warrant for the generator by permitting William Meisling, the Chief of Security at the Milford Proving Grounds, to enter the plaintiff's premises and conduct a general inspection for the suspected stolen GM property?"

■■■■■ Whether a court uses a special or general verdict rests in its discretion, as does the content and form of any interrogatories it chooses to submit. *Portage II v. Bryant Petroleum Corp.*, 899 F.2d 1514, 1520 (6th Cir.1990). Therefore, an appellate court reviews for an abuse of discretion. Federal Rule of Civil Procedure 49 governs the use of special verdicts and general verdicts with interrogatories. A special verdict is used where the jury finds only issues of fact and the court applies the law, as opposed to a general verdict with interrogatories, which is used to give close attention to certain factual matters. *Portage II*, 899 F.2d at 1520.

The court below clearly used the latter. "Where special verdicts are involved, the jury's sole function is to determine the facts; therefore, neither an instruction on the law nor a summary concerning their role in relation to the law was necessary." *Id.* at 1521. The court's twenty-four jury instructions discussed legal matters in detail, and also required the jury to apply the law to the facts. The verdict form served only to direct the jury's attention to the most important issues: reasonableness, good faith, proximate cause, and damages.

Bills's proposed interrogatory is admittedly more detailed, but asks a question that is only slightly different. The plaintiff emphasizes whether Aseltine unreasonably exceeded the scope of the search warrant, while the court focuses on whether Aseltine's invitation was unreasonable. Undoubtedly, Bills would have preferred to remind the jury through the interrogatory that Meisling's presence

was beyond the scope of the search warrant for the generator. However, that is the job of Bills's attorney at closing argument.

Bills cites several cases for the obvious proposition that special interrogatories must fairly present the relevant issues to the jury. Yet reasonableness, good faith, proximate cause and damage *are* the relevant issues. Further, the interrogatories must be considered in the context of the entire jury charge. *United States v. Buckley*, 934 F.2d 84, 87 (6th Cir.1991). In light of the court's detailed jury instructions, the interrogatories were neither inaccurate, misleading nor confusing.

**D. The district court's denial of Bills's motion for a directed verdict.**

■■■■■ At the close of the trial, plaintiff moved for a directed verdict because (1) Meisling was a trespasser as a matter of law; and (2) Aseltine "had not presented any defense to the claim that Meisling's presence and photographic tour of the plaintiff's home, as permitted and facilitated by the police, was an unconstitutional intrusion." *Pet. Brief* at 21. An appellate court reviews a ruling on a motion for directed verdict *de novo*. *King v. Love*, 766 F.2d 962, 969 (6th Cir.), *cert. denied*, 474 U.S. 971, 106 S.Ct. 351, 88 L.Ed.2d 320 (1985). A directed verdict is proper only where no reasonable juror could find for the nonmoving party. *Fite v. First Tennessee Prod. Credit Ass'n*, 861 F.2d 884, 889 (6th Cir.1988).

The first part of Bills's argument is meritless because whether Meisling was a trespasser under state law was not dispositive, nor relevant, to Bills's claim of a constitutional violation under 42 U.S.C. §§ 1983, 1985, or 1986. The second part of the argument completely misinterprets the law. Bills claims that: "Aseltine was required to present some constitutional justification for Meisling's intrusion. When the defendant failed to present any such evidence, the plaintiff was entitled to a directed verdict." *Pet. Brief* at 25.

This assertion could not be more incorrect. The court in *Bills I* made it clear that Meisling's presence alone would not justify a finding of liability:

In this case, Meisling obviously had no warrant of his own, and his intrusion was separate and distinct from the police entry.... The matter does not end here, however, because the issue in this case is not whether Meisling's photographic tour of the premises, per se, was unconstitutional....

958 F.2d at 703. In fact, the court stated explicitly that *"Meisling's inspection tour* and photographing of items in the plaintiff's home, by itself; *while perhaps constituting a trespass, does not offend the Fourth Amendment." Id.* at 704 (emphasis added).

Because Bills's claim for a directed verdict has no legal foundation, the district court correctly denied her motion.

### E. Sufficiency of Jury Instruction # 17 as to the Fourth Amendment and the court's denial of Plaintiff's Proposed Instructions # 17 and # 18.

█ Plaintiff contends that the "entirety of the legal instruction to the jury on the Fourth Amendment requirements consisted of one sentence" and that it was a "totally improper, inaccurate, and incomplete statement of the law" because it "focuses entirely on the decision to 'invite' Meisling." *Pet. Brief* at 26. The court's instruction read as follows:

> The question that you must decide is whether, under all of the circumstances, Sgt. Aseltine unreasonably exceeded the scope of his authority under the warrant by inviting William Meisling, a private citizen, to enter plaintiff's home during the execution of the warrant on August 20, 1987.

"The standard on appeal for a court's charge to the jury is whether the charge, taken as a whole, fairly and adequately submits the issues and applicable law to the jury." *Buckley,* 934 F.2d at 87 (quoting *United States v. Martin,* 740 F.2d 1352, 1361 (6th Cir.1984), *cert. denied,* 472 U.S. 1029, 105 S.Ct. 3506, 87 L.Ed.2d 636 (1985)).

Plaintiff's criticism of the above instruction lacks merit. First, the above sentence was only the *second* paragraph of the court's very lengthy Jury Instruction # 17. Most impor-

tantly, its language mirrors that used by the Sixth Circuit in discussing the case:

> Thus, the principal question in this case is whether the officers exceeded the scope of their authority under the warrant in inviting Meisling to conduct an inspection of a private dwelling they controlled....
>
> ....
>
> .... Whether this breached the trust under which they held the premises in their complete command, or whether, stated another way, this unreasonably exceeded the scope of the warrant, is a question for a jury in this case.

*Bills I,* 958 F.2d at 705. In fact, this court used similar language in remanding the case to the district court:

> [T]he district court's grant of summary judgment on the issue of the constitutionality of the search ... is REVERSED because genuine issues of fact exist concerning the reasonableness of the conduct of the police in inviting a private citizen into the dwelling of another for purposes unrelated to the execution of the search warrant.

*Id.* at 709.

Moreover, the two jury instructions proposed by plaintiff are wholly inappropriate and often redundant and inaccurate. A cursory review of Plaintiff's Proposed Instruction # 17 reveals it to be a short summary of plaintiff's argument, which concludes by stating: "Consequently, the principle [sic] issue in this case is whether or not the defendant exceeded the scope of the authority under the search warrant for the stolen generator by inviting Meisling to conduct an inspection of the plaintiff's home." This statement does not differ significantly from the district's actual instruction, or this court's explanation of the pertinent issues in *Bills I.*

Additionally, Plaintiff's Proposed Instruction # 18 is unnecessary and misleading. It first notes that Meisling was not lawfully in the Billses' home, which is not legally relevant since Meisling is not a state actor and thus cannot violate the Fourth Amendment. A jury, however, could be misled into believing that a trespass by Meisling was necessarily a constitutional violation by Aseltine.

Further, the plaintiff's instruction attempts to dictate what is "reasonable," [5] which is the ultimate issue to be decided by a jury.

### F. The district court's decision to allow witnesses to use the terms "stolen" and "GM property."

▋ Bills asserts that the district erred by allowing defense witnesses repeatedly to characterize property seen in Bills's home during the search as "stolen" or "GM property." The plaintiff claimed that these references were prejudicial and inflammatory, and counsel duly objected at trial. A district court has wide latitude to admit evidence, and an appellate court will reverse only for an abuse of discretion. *United States v. Rios*, 842 F.2d 868, 872 (6th Cir. 1988) (per curiam), *cert. denied*, 488 U.S. 1031, 109 S.Ct. 840, 102 L.Ed.2d 972 (1989). A reviewing court should view the evidence in the light most favorable to the proponent, minimizing its prejudicial effect and maximizing its probative value. *United States v. Brady*, 595 F.2d 359, 361 (6th Cir.), *cert. denied*, 444 U.S. 862, 100 S.Ct. 129, 62 L.Ed.2d 84 (1979).

In allowing testimony mentioning the GM property found in the Billses' house, the district judge recognized that defense counsel was attempting to emphasize that the plaintiff's husband and son had been engaged in wrongdoing. However, the court considered this a permissible strategy, and one that could backfire:

> [A]s an experienced trial lawyer, you, you knew that, when you bring a case such as you brought, where ... you knew that there was going to be evidence that there was this stolen property in this house, that it shouldn't come in as any surprise to you that the defendant's going to, that's all they're going to do is talk about that stolen property.... [Y]ou can examine and say, well, you didn't steal it, so why should you lose your job? ... And sometimes, sometimes that will, that will work for you, to your benefit, it [sic] it's over exaggerated

and things like that, see. But I can't sterilize the case for you.

The judge specifically told plaintiff's counsel that he could ask Mrs. Bills if she had stolen any of the property in order to dispel any implication of wrongdoing by her. Bills's real problem is that a jury might infer that she was culpable because of the unusually large number of items in her home and because her husband and son had in fact taken GM property; that is not an entirely unreasonable inference. Since much of the property was indeed "stolen" and "GM property," plaintiff's counsel could not claim that the terminology was inaccurate.

When we maximize the relevance, minimize the prejudice, and recognize the accuracy of the references to stolen property, we hold that the judge did not abuse his discretion by allowing the witnesses to refer to "stolen" and "GM property." The information was relevant to the reasonableness of Aseltine's actions because both he and Meisling claimed that they suspected that there was stolen property in the Billses' home. The issue of stolen property also related to Mrs. Bills's loss of her job, for which she sought damages. Further, there was a question of whether Mrs. Bills was or should have been aware of the activities of her husband and son. Although her complicity is irrelevant to whether Aseltine acted unreasonably in admitting Meisling to her home, it could relate to her claims of emotional distress allegedly suffered as a result of her privacy being invaded; a jury could conclude that one who knowingly harbors stolen property is less offended when it is eventually discovered by law enforcement personnel or civilians.

### III

We hold that the district court properly granted summary judgment for defendants on Bills's claims under the Michigan Constitution, because individuals cannot be liable under Michigan law for constitutional violations. Also, the district court correctly denied plaintiff's motion for a directed verdict.

---

5. The instruction adds: "If the defendant aided or facilitated Meisling's presence at the plaintiff's home in order to allow Meisling to search for evidence of a crime that was totally unrelated to the stolen generator then, in that event, the defendant violated the Fourth Amendment."

Although the district court may have erred in granting the other police officers summary judgment on the issue of qualified immunity, the jury's verdict for the defendant cures any potential error. Because Aseltine acted more affirmatively and with greater knowledge than the other officers, the jury's decision that Aseltine acted reasonably is collateral estoppel on the issue of the other officers' reasonableness, thus entitling them to qualified immunity.

Last, we hold that the content and form of the district court's general verdict form with special interrogatories, its decision to allow the defendants' witnesses to refer to the property observed in the Billses' home as "stolen" or "GM property," and the court's instructions to the jury were not abuses of discretion.

The judgment of the district court is therefore AFFIRMED.